UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                           :

UNITED STATES OF AMERICA     :

                         :

        - *v.* -         :         19 Cr. 802 (GBD)

                         :

MENDEL ZILBERBERG,      :

                         :

         Defendant.     :

                         :

                         :

------------------------------------------------------x


## <u>THE GOVERNMENT'S MOTIONS *IN LIMINE*</u>


DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Dina McLeod
Daniel G. Nessim
Kimberly J. Ravener
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

**BACKGROUND** ......................................................................................................... **4**

**I.      THE FRAUDULENT LOAN SCHEME** .............................................................. **5**

**II.     THE DEFENDANT'S VIOLATIONS OF FEDERAL REGULATION AND
        BANK POLICY** ..................................................................................................... **9**

**III.    THE DEFENDANT'S RELATED FRAUDS ON THE BANK** ................................ **10**

**ARGUMENT** .................................................................................................................. **10**

**I.      EVIDENCE OF THE DEFENDANT'S FACILITATION OF OTHER LOANS
        FROM WHICH HE BENEFITTED IS ADMISSIBLE AS DIRECT
        EVIDENCE AND PURSUANT TO RULE 404(B)** ................................................ **10**

**II.     THE DEFENDANT'S VIOLATION OF REGULATION O AND BANK
        POLICY IS ADMISSIBLE AS DIRECT EVIDENCE AND PURSUANT TO
        RULE 404(B)** ........................................................................................................ **18**

**III.    EVIDENCE OF THE LOSS TO THE FDIC AND BANK-2 IS RELEVANT
        AND ADMISSIBLE** ............................................................................................... **20**

**IV.     STATEMENTS OF FRIED AND OTHERS ARE ADMISSIBLE PURSUANT
        TO RULE 801 AS CO-CONSPIRATOR STATEMENTS AND STATEMENTS
        BY THE DEFENDANT'S EMPLOYEES WITHIN THE SCOPE OF THEIR
        EMPLOYMENT** ..................................................................................................... **22**

**V.      THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT
        CONCERNING VICTIMS' NEGLIGENCE** .......................................................... **26**

**VI.     EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S
        FAMILY BACKGROUND, HEALTH CONDITION, AGE, OR ANY OTHER
        PERSONAL FACTORS UNCONNECTED TO GUILT SHOULD BE
        PRECLUDED, AS SHOULD DISCUSSION OF PUNISHMENT** .......................... **28**

**VII.    EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANTS' PRIOR
        COMMISSION OF "GOOD ACTS" OR NON-COMMISSION OF OTHER
        BAD ACTS SHOULD BE PRECLUDED** ............................................................... **29**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                            :
UNITED STATES OF AMERICA                    :
                                            :
            - v. -                          :           19 Cr. 802 (GBD)
                                            :
MENDEL ZILBERBERG,                          :
                                            :
                        Defendant.          :
                                            :
                                            :
-----------------------------------------------------x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully seeks rulings *in limine* on several issues prior to trial against defendant Mendel Zilberberg, which is scheduled to begin on January 23, 2023.  The defendant is charged with facilitating the approval of a fraudulent $1.4 million loan from a bank (the "Bank") of which he was a director, through the use of a straw borrower.  The defendant received over $400,000 in fraudulent loan proceeds.  Despite his knowledge of a federal regulation and Bank policy which place specific controls on bank lending to insiders, the defendant never disclosed his interest in the loan to the Bank.

*First*, the Government seeks to admit evidence that the defendant also facilitated the approval of other loans from the Bank from which he benefitted, without disclosing his interest in those loans, as direct evidence of the charged conduct, and in the alternative, pursuant to Rule 404(b).

*Second*, the Government seeks to admit evidence related to the defendant's violation of a particular regulation of the Board of Governors of the Federal Reserve System, as well as Bank policy, governing self-dealing by bank insiders as direct evidence of the charged conduct, and in the alternative, pursuant to Rule 404(b).

3

*Third*, the Government seeks to offer evidence of the loss to the Bank as a result of the charged conduct.

*Fourth*, the Government seeks to admit statements of co-conspirators and employees of the defendant pursuant to Federal Rule of Evidence 801.

*Fifth*, the Government seeks to preclude certain evidence or argument that is wholly irrelevant to the issues at trial, and/or for which any probative value is substantially outweighed by the risk of juror confusion, distraction from the evidence, unnecessary lengthening of the trial, and/or unfair prejudice to the Government.  Specifically, the Government moves to preclude:

(1) Argument that any negligence on the part of a victim is a defense to the charges;

(2) Evidence or argument concerning the defendant's family background, health condition, age, or any other personal factors unconnected to his guilt or innocence, and the potential punishment he faces if convicted; and

(3) Evidence or argument concerning the defendant's prior commission of good acts or lack of bad acts.

## BACKGROUND

In approximately June 2009, Aron Fried and another co-conspirator ("CC-1"), who had been previously convicted of federal health care fraud, began planning to obtain a loan to fund CC-1's investment into Fried's home health care business, Emanuel Services, Inc. ("Emanuel"). Indictment ¶ 1.  Since Fried and CC-1 knew that CC-1's felony conviction and lack of creditworthiness impaired him from obtaining the loan in his own name, CC-1 enlisted an acquaintance to sign for the loan and serve as a straw borrower (the "Straw Borrower"). *Id*. Fried and CC-1 partnered with the defendant, Mendel Zilberberg, then a director at a Manhattan-based bank insured by the Federal Deposit Insurance Corporation (the "Bank"), to effectuate the scheme using Zilberberg's connections at the Bank.  *Id*. at ¶¶ 1-2.  Together, Zilberberg, Fried, and CC-1 concocted a false premise for the loan, supported the application with false and misleading

4

representations, and set up pass-through bank accounts to funnel the proceeds of the loan to themselves.  *Id.* at ¶ 1.  Based on the false representations made to the Bank and Zilberberg's involvement in the loan approval process, the Bank issued a $1.4 million loan ("Loan-1") to the Straw Borrower.  With CC-1's help, the proceeds were quickly disbursed to Zilberberg, Fried, and CC-1.  *Id.*  The same day that Loan-1 funded, a company controlled by Zilberberg received approximately $466,000 of the loan proceeds.  *Id.* at ¶¶ 1, 13(b).

On or about November 8, 2019, a grand jury sitting in this District returned an Indictment charging Zilberberg with five counts: (1) conspiracy to commit bank fraud in violation of Title 18, United States Code, Sections 1349 and 3293 (Count One); (2) bank fraud, in violation of Title 18, United States Code, Sections 1344, 3292, and 2 (Count Two); (3) conspiracy to make false statement to a bank, in violation of Title 18, United States Code, Sections 371 and 3293 (Count Three); (4) making false statements to a bank, in violation of Title 18, United States Code, Sections 1014, 3293, and 2 (Count Four); and (5) embezzlement and misappropriation of bank funds, in violation of Title 18, United States Code, Sections 656, 3293, and 2 (Count Six).[1]  Fried was charged in the same Indictment for his participation in the Loan-1 scheme.  On November 15, 2022, Fried pleaded guilty to conspiracy to commit bank fraud, as set forth in a Superseding Information.

## I.    THE FRAUDULENT LOAN SCHEME

Fried informed CC-1 that he had a "friend" at the Bank, that is, Zilberberg, who could get a loan approved quickly for CC-1.  In addition to serving as a director at the Bank, Zilberberg was an attorney who had consulted with CC-1 regarding the consequences of CC-1's prior felony conviction on CC-1's plans to go into business with Fried.  Fried told CC-1 that Zilberberg would

---

[1] Count Five charged Fried with making false statements to a bank, in violation of Title 18, United States Code, Sections 1014, 3293, and 2.

receive a portion of the Loan-1 proceeds, consisting of approximately one-third, or $466,000, as a favor for helping to obtain Loan-1.  While CC-1 had originally hoped to seek a smaller loan of approximately $400,000, CC-1 learned from Fried that Zilberberg got the unsecured loan approved for the much greater sum of $1.4 million.

At CC-1's behest, on or about August 31, 2009, the Straw Borrower and his wife applied for Loan-1, an approximately $1.4 million unsecured line of credit, from the Bank.[2]  That same day, Zilberberg emailed the loan officer handling the Loan-1 application at the Bank ("Employee-1"), stating that Zilberberg's office would be sending documents relating to Loan-1 shortly, and asking Employee-1 to "process asap."  Indictment at ¶ 9(a).

Zilberberg continued to send many emails to the Bank to facilitate Loan-1 getting approved, including providing false financial information for the Straw Borrower and providing a false purpose for Loan-1, even though Zilberberg was aware that the Loan-1 proceeds were going to be sent to CC-1 and Fried, as well as himself.  For example, on the day of the Loan-1 application, August 31, 2019, Zilberberg emailed a net worth statement for the Straw Borrower to Employee-1 that contained various false statements, including the misleading representation that the Straw Borrower owned CC-1's $2.5 million home.[3]  Indictment at ¶ 9(a).  Later that same day, Employee-1 emailed Zilberberg, asking, "what should I put down as the purpose of the loan?"  Zilberberg replied: "To be able to take advantage of business opportunities?"  At the time, Zilberberg knew – but hid from the Bank – the true purpose of Loan-1.  Indeed, Zilberberg represented an entity

---

[2] The charges in this case were subject to a statute of limitations tolling agreement.  The defendant has informed the Government, through counsel, that he does not intend to raise a statute of limitations defense.

[3] In reality, CC-1's home had been temporarily fraudulently conveyed to the Straw Borrower in order to inflate his assets to support Loan-1 and to induce the Straw Borrower to apply for Loan-1.  *See id.* at ¶ 8.

formed by Fried and another business partner to purchase Emanuel, and facilitated the purchase of Emanuel using proceeds from Loan-1.  To maintain the lies on the Loan-1 application, Fried told CC-1 that, if asked, the Straw Borrower needed to tell Bank personnel that Loan-1 was for an investment in the Straw Borrower's own business.  *Id*. at ¶ 8.

The Bank's internal review of Loan-1 was summarized in a presentation intended for internal bank review (the "Presentation").  The Presentation falsely listed Straw Borrower as a "client" of Zilberg, a Bank board member who also maintained his own law firm and other businesses.  The Presentation falsely stated that the purpose of Loan-1 was "[t]o be used for working capital for business investments," citing the Straw Borrower's company.  The Presentation falsely noted that the Straw Borrower "stated that he needs funds to make additional investments, such as down payments on properties, etc. The flexibility of a line of credit will make these investments possible."  The Loan-1 documents did not mention CC-1, Fried, or Emanuel, nor did they disclose Zilberg's financial interest in Loan-1.

On or about September 8, 2019, Zilberg emailed Employee-1 that Employee-1 should prioritize Loan-1 over others because it "is the important one."  Indictment at ¶ 9(b).  On or about September 10, 2009, Zilberg emailed Employee-1 again regarding Loan-1, asking, in substance and in part, "Are we on track.  When will this fund."  Indictment at ¶ 9(c).  In a further email exchange the same day, Employee-1 informed Zilberg that Employee-1 needed information on additional income for the Straw Borrower because the debt-service coverage ratio was too low.  *Id*.  On or about September 11, 2009, an assistant to Zilberg supplied Employee-1 with documents purporting to show additional income for the Straw Borrower to support Loan-1, and stated, in substance and in part: "Mr. Zilberg sends the following documents and asks if you would return reply with a funding date please."  Indictment at ¶ 9(d). On or about September 13,

2009, Zilberberg emailed one of his employees ("Employee-2") to follow up on Loan-1 and indicated that it involved both the Straw Borrower and Fried.  Indictment at ¶ 9(e).  On or about September 14, 2009, Employee-2 emailed Zilberberg stating, in substance and in part, that Employee-1 said Loan-1 was out of Employee-1's hands and that Zilberberg "can get it moved along etc."  Zilberberg responded "OK."  Indictment at ¶ 9(f).

On or about September 18, 2009, the Bank funded Loan-1, depositing approximately $1.4 million into an account held in the Straw Borrower's name.  Bank records reflect that Loan-1 proceeds were promptly distributed into accounts controlled by Zilberberg, Fried, and CC-1.  From the proceeds of Loan-1, CC-1 sent a total of approximately $900,000 to Fried.  In turn, Fried transferred $466,000 from the Loan-1 funds to One World United, Inc. ("One World"), a business owned by Zilberberg.  Indictment at ¶¶ 13(a)-(h).

The deposit of the $466,000 in Loan-1 proceeds to Zilberberg's One World bank account increased its holdings ten-fold.  Email communications show that, during the two weeks Loan-1 was pending approval, One World needed money.  On September 1, 2009, the day after the Straw Borrower applied for Loan-1, Zilberberg's employee wrote the following to Zilberberg: "Any hope on Fried?  [A One World employee] needs money desperately to pay the donor on Thursday and rent is past due."  Zilberberg followed up with information about where additional money could come from and asked questions about whether they would have anything left after an unrelated $50,000 infusion.

Within approximately one year, Loan-1 fell into default.  The Bank itself was closed by the New York State Banking Department in or about March 2010, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as the receiver of the bank.  Loan-1 and other Bank

obligations were assumed by a successor ("Bank-2"). Loan-1 was never fully repaid, and Bank-2 and the FDIC suffered a combined loss of over $1 million on Loan-1.

In or about 2011, Bank-2 sued the Straw Borrower to collect on Loan-1, and CC-1 and Fried arranged for settlement discussions on behalf of the Straw Borrower through an attorney referred by Fried's nephew. In connection with those settlement discussions, false representations continued to be made to Bank-2 to maintain the false impression that the Straw Borrower was the actual borrower on Loan-1. Indictment at ¶ 17. The FDIC commenced an investigation into Loan-1. During the FDIC investigation, Fried asked CC-1 not to mention to the FDIC that $466,000 went to Zilberg. Fried told CC-1 that, if asked, Fried planned to lie and claim the funds were "legal fees."

## II.    THE DEFENDANT'S VIOLATIONS OF FEDERAL REGULATION AND BANK POLICY

Zilberg's conduct was in violation of Regulation O of the Board of Governors of the Federal Reserve System ("Regulation O"), which prohibits extensions of credit and transfers of extensions of credit to insiders of the Bank, such as directors like Zilberg, unless such extensions are on market terms and do not involve more than the normal risk of nonpayment. *See generally* 12 C.F.R. § 215.4.

In addition, Regulation O requires that the Bank maintain records of all extensions of credit, or transfers of extensions of credit, to insiders of the Bank. Beginning in or about 2008, Zilberg served on the Compliance Committee of the Bank's Board of Directors, which was responsible for ensuring compliance with Regulation O. The Bank's credit policy dictated that the Board of Directors must approve all loans subject to Regulation O. Indictment at ¶ 4. Nevertheless, Zilberg failed to disclose his interest in Loan-1 to the Bank, dodged the required scrutiny of the Board of Directors, and allowed Loan-1 to be approved based on false

representations, including the central lie that Loan-1 was for the Straw Borrower.  Moreover, Loan-1 was approved by the Bank's management despite the fact that it was not recommended by the loan officer handling Loan-1, because it presented a high risk of nonpayment based on the Straw Borrower's stated financial information.

## III.    THE DEFENDANT'S RELATED FRAUDS ON THE BANK

Around the same time of the charged conduct, Zilberberg facilitated at least three other loans from the same Bank in order to obtain funds for himself, none of which disclosed his interest to the Bank in violation of Regulation O.  First, in or about July 14, 2008, Zilberberg asked his niece ("Borrower-2") to apply for a $118,000 loan ("Loan-2") as a ruse to obtain the funds himself. Bank records establish that all of the Loan-2 proceeds were transferred to Zilberberg on the same day that Loan-2 funded.  Loan-2 later defaulted.

Second, in or around the same time Loan-1 was obtained, Zilberberg facilitated another loan ("Loan-3") to one of his law firm clients ("Borrower-3"), which resulted in transfers of hundreds of thousands of dollars to Zilberberg for purported legal fees.

Third, also in or around the same time Loan-1 was obtained, Zilberberg sought a $1.4 million loan from the Bank for Fried's father-in-law ("Borrower-4") which was ultimately approved for only $300,000 ("Loan-4").  The sole purpose of Loan-4 was to provide money to Fried, and some of the proceeds were also used to pay Zilberberg's purported legal fees.

## ARGUMENT

## I.    EVIDENCE OF THE DEFENDANT'S FACILITATION OF OTHER LOANS FROM WHICH HE BENEFITTED IS ADMISSIBLE AS DIRECT EVIDENCE AND PURSUANT TO RULE 404(B)

Evidence concerning the defendant's facilitation and improper involvement in three other loans from the same Bank, during the same period as the charged conduct, is admissible at trial both as direct evidence of the charged offenses, and, in the alternative, pursuant to Rule 404(b).

### A.      Relevant Facts

*First*, at Zilberberg's direction, his niece, Borrower-2, obtained a straw loan from the Bank in the summer of 2008 for Zilberberg.  Zilberberg convinced Borrower-2 that he could help Borrower-2 gain interest earnings by taking out a loan and giving him the proceeds.  Borrower-2 was a close relative of Zilberberg, and trusted Zilberberg.  On July 22, 2008, Borrower-2 signed a business loan agreement, a promissory note, and a disbursement request for Loan-2, a $118,000 loan from the Bank.  The "primary purpose of loan" was falsely listed as "business (including real estate investment)", with the "specific purpose" of Loan-2 identified as "working capital" – just as in the fraudulent Loan-1 Presentation described above.   In reality, Borrower-2 was a schoolteacher who operated no such business.  Borrower-2 did not read any of these documents before signing.  Borrower-2 allowed Zilberberg and his personal employees to handle all of her dealings with the Bank.

The entire proceeds of Loan-2 were transferred to Zilberberg on the same day the Bank disbursed Loan-2.  Borrower-2 never received the "interest" promised by Zilberberg.  For a period of time, Zilberberg paid nominal monthly interest payments on Loan-2.  On August 4, 2009 – just weeks before the Straw Borrower applied for Loan-1 – Borrower-2 signed a change of terms agreement extending the maturity date of Loan-2 into 2010, as well as an assignment of deposit account with the Bank, providing the full balance of her own savings account as collateral for Loan-2.  That day, a Bank employee emailed Zilberberg copies of the two loan documents for Borrower-2.  Loan-2 defaulted, and Borrower-2's personal savings were used to satisfy Loan-2.

*Second*, at approximately the same time that Zilberberg facilitated Loan-1, in or about September and fall 2009, he also facilitated the expansion of a Bank loan for a client of Zilberberg's law firm, Borrower-3.  In May 2009, the Bank had approved Loan-3, a $600,000 loan to Borrower-3, and, in September 2009, Borrower-3 sought a $400,000 expansion to Loan-3.

11

Borrower-3 and Zilberg represented that the Loan-3 proceeds would be used to fund business expenses of Borrower-3's homecare business. Specifically, Borrower-3 had an ownership interest in a homecare business and was engaged in a business dispute with a co-owner, which involved litigation. Zilberg made specific representations to the Bank employees that $400,000 in Loan-3 funds would be to pay withholding taxes that Borrower-3's former business partner had failed to pay; the same representations were included in the materials submitted to the Bank for approval. Borrower-3 was ultimately authorized to draw on an approximately $1 million line of credit. Contrary to Zilberg's representations that the money would be used to pay withholding taxes, however, hundreds of thousands of dollars in Loan-3 proceeds went to pay Zilberg.

*Third*, also beginning in or about Fall 2009, Zilberg took part in seeking Loan-4, a loan in the name of Fried's father-in-law, Borrower-4. Loan-4 was initially sought for $1.4 million, the same amount as Loan-1, but was ultimately approved only up to $300,000. Zilberg was involved in facilitating Loan-4 and ensuring it was approved. The Loan-4 presentation, submitted to the Bank for approval in December 2009, stated that Borrower-4 was "known to Mendel Zilberg." It also stated that Borrower-4 would use the Loan-4 proceeds for physical improvements of a food store that Borrower-4 operated in Brooklyn. In reality, however, the Loan-4 funds were transferred to Fried, and a portion was also paid to Zilberg.

Zilberg was actively engaged in getting Loan-3 and Loan-4 approved and funded contemporaneously, and often in the same communications, as Loan-1. For example, on or about September 2, 2009, Zilberg emailed the loan officer for all three loans (Employee-1) and asked "is it possible that one of the packages will be ready for signature tomorrow." The loan officer responded "[Borrower-3] is with Matt for checking should be signed tomorrow . . . ." Zilberg

responded, "I meant one of the other two," meaning Loan-1 and Loan-4.  As another example, on or about September 3, 2009, Zilberberg emailed the loan officer stating that he "knew" the [Borrower-3 loan] "was ok.  The question is one of the 2 [loans].  If there is a way to fast track it I would appreciate it."  And, on or about September 8, 2009, in response to an email concerning all three loans, in the same email where Zilberberg stated that Loan-1 "is the important one," Zilberberg also referenced Loan-3.

### B.    Applicable Law

Direct evidence of a crime is not limited to "that which directly establishes an element of the crime."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  Rather, direct evidence includes evidence that is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).

Evidence of uncharged acts may also be admissible as background evidence where it is used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) place charged events in context.  *See, e.g., United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (uncharged acts are admissible background where they provide "context of certain events relevant to the charged offense"); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Rule 404(b) allows for the admission of uncharged crimes, wrongs, or other acts for purposes other than proving criminal propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity."  *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted).  Applying this approach, the Second Circuit has routinely approved of the admission of "other acts" evidence with respect to the issues of knowledge, intent, and/or motive.  *See, e.g.*, *United States v. Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1993); *United States v. Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994).  Where the defendant claims his conduct has an innocent explanation, the admission of such evidence of prior acts is particularly appropriate.  *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

The defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offenses with which he is charged.  *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the Government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b).  *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994).  Where evidence is offered for a

proper purpose under Rule 404(b), it may only be excluded if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *Zackson*, 12 F.3d at 1182; Fed. R. Evid. 403. Evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999).

### C.   Discussion

#### a.   Loan-2, Loan-3, and Loan-4 are Admissible as Direct Evidence of the Charged Conduct

Loan-2, Loan-3, and Loan-4, all of which involved Zilberberg's involvement or encouragement to fund from the same Bank, during the same time frame of Loan-1, are admissible as direct evidence at trial.

*First*, all three loans are admissible as direct evidence to provide background and context for the conspiracy, to show its means and methods, and to demonstrate the nature of the criminal relationship between Zilberberg and Fried. *See, e.g. United States v. Faison*, 393 F. App'x 754, 759 (2d Cir. 2010) ("District courts have 'discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.'" (quoting *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993))); *see, e.g.*, *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (upholding admission of evidence including "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed"). In addition to common tactics, scheme participants, beneficiaries, and funding methods, these three loans also involved Zilberberg's use of common Bank personnel – such as Employee-1 – in order to facilitate his scheme, all supporting the admission of this evidence as direct evidence of the charged conduct. *See United States v. Mavashev*, 455 F. App'x 107, 112 (2d Cir. 2012) (holding that "[e]vidence of

uncharged acts is also admissible to demonstrate a pattern of conduct engaged in by defendant and others of which the crime charged was part") (*quoting United States v. Papadakis*, 510 F.2d 287, 295 (2d Cir. 1975) (internal quotation marks omitted).

*Second*, the Borrower-3 and Borrower-4 loans are admissible as direct evidence as inextricably intertwined with the evidence relating to Loan-1 and necessary to complete the story of the crime at trial. *See Carboni*, 204 F.3d at 44. During the same time frame that Zilberg advanced Loan-1 through Bank, he was also working to get Loan-3 and Loan-4 approved and funded. His efforts to influence the Bank loan officers for all three loans were often conducted at the same time, including over the same email communications. It would be impossible to separate out Zilberg's corrupt efforts with Loan-3 and Loan-4 from his conduct relating to Loan-1 itself, as Zilberg advanced all three collectively for the same purpose of satisfying his own greed.

      b.   Evidence of Loans -2, -3, and -4 are Admissible Under Rule 404(b)

Evidence of Loan-2, Loan-3, and Loan-4 is also admissible under Rule 404(b). In championing and facilitating these three loans for supposed third parties, but for which Zilberg or Fried were the ultimate primary beneficiaries, evidence concerning all three loans provides important proof of Zilberg's plan and preparation, knowledge, intent, motive, absence of mistake, and the existence of a common scheme across these frauds. *See, e.g., United States v. Jackson,* 792 F. App'x 849, 853 (2d Cir. 2019) (affirming admission of defendant's prior conviction for bank fraud to show proof of the defendant's knowledge and intent where the defense argued he "blundered into the fraudulent transactions at issue," namely, a loan fraud scheme); *United States v. Derosena*, 186 F. App'x 27, 29 (2d Cir. 2006) (affirming admission of prior fraudulent acts in a bank fraud case to show "knowledge and intent and for the purpose of showing a prior course of dealings between the conspirators"); *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (affirming admission of prior extortionate lending where the defendant

"attempted to distance himself" from the charged acts of extortionate lending and a common co-conspirator involved in both sets of conduct); *United States v. Reese*, 933 F. Supp. 2d 579, 582 (S.D.N.Y. 2013) (admitting evidence of the defendant's prior frauds to show knowledge and intent in a bank fraud prosecution where "each prior conviction involves [the defendant] engaging in fraudulent practices to gain money" as well as "the same type of action" at issue in the charged conduct).   Given the similarity of the conduct and the contemporaneous or very proximate timeframe, evidence of these three loans is highly probative of these issues, which all go toward the defendant's state of mind.

The evidence is also similar to, and no more inflammatory than, the evidence of the charged Loan and thus its admission complies with Rule 403. *See United States v. Rahim*, 339 F. App'x 19, 23 (2d Cir. 2009) (introduction of 404(b) evidence not prejudicial because "the evidence was not more sensational than the evidence of the charged crime and did not consume a major portion of the trial time"); *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (introduction of 404(b) evidence not prejudicial because it "represented only a tiny fraction of the testimony heard by the jury, and did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").   To the extent there exists a risk that the jury may make an impermissible propensity inference, such risk is appropriately addressed through a limiting instruction.   *United States* v. *Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *See United States v. Williams*, 526 F. App'x 29, 35 (2d Cir. 2013) (approving district court's admission of Rule 404(b) evidence, and noting that "the court administered an appropriate limiting instruction, telling the jury that the evidence could only be considered with respect to the issue of knowledge or intent").

## II.   THE DEFENDANT'S VIOLATION OF REGULATION O AND BANK POLICY IS ADMISSIBLE AS DIRECT EVIDENCE AND PURSUANT TO RULE 404(B)

At trial, the Government expects to offer evidence that the defendant was the beneficiary of numerous loans from the Bank which violated Regulation O and Bank policy.  As part of that evidence, the Government anticipates offering testimony and documents related to the requirements of Regulation O and the Bank's policies on loans to Bank insiders.  The Government also expects to offer evidence that the defendant was familiar with Regulation O and acted as the chair of the Bank's Compliance Committee.  The evidence as to these violations is admissible as direct evidence of the offense.  Alternatively, this evidence is admissible pursuant to Rule 404(b) because it is evidence of the defendant's intent to commit the crime, his opportunity to commit the crime, and the absence of mistake.

### a.   Evidence of the Defendant's Violation of Bank Regulation and Policy is Admissible as Direct Evidence of the Charged Conduct

Evidence that the defendant repeatedly and flagrantly violated Regulation O and bank policy against self-dealing rules is direct evidence of his participation in a scheme to commit bank fraud.  Such evidence "goes directly to the question of whether [the] defendant acted with the requisite intent."  *See United States v. Kaufman*, No. 19-CR-0504 (LAK), 2021 WL 51521, at *1 (S.D.N.Y. Jan. 6, 2021) (granting the Government's motion *in limine* to offer evidence of the defendant's violation of credit union policy as direct evidence of a bank bribery scheme); *see also United States v. Parker*, 364 F.3d 934, 942 (8th Cir. 2004) (concluding that testimony regarding scope and substance of an FTC rule was admissible "to show Parker's intent to deceive if he knowingly failed to comply with the rule")*; United States v. Harvard*, 103 F.3d 412, 422 (5th Cir. 1997) ("Evidence of civil banking regulations is admissible for the limited purpose of showing the defendant's motive or intent.").

Whether the defendant, in committing the fraud, also knowingly violated a federal regulation squarely aimed at preventing insiders from self-dealing is highly probative of the defendant's wrongful intent.  The proffered evidence is also relevant to the manner and means by which the defendant committed the crime.  If the defendant had been truthful in his disclosures to the Bank, he likely would have alerted the Bank to the fraud.  *See United States v. Vaccarelli*, No. 20-3768-CR, 2021 WL 4805218, at *2 (2d Cir. Oct. 15, 2021) (affirming the admission of testimony that the defendant violated TIC and FINRA regulations as direct evidence of the charged offense and concluding that the evidence was "probative of the manner and means by which Vaccarelli committed the charged offense" because "had Vaccarelli been truthful in his disclosures to TIC, he likely would have alerted his employer to his fraudulent schemes").

Nor is the significant probative value of such evidence substantially outweighed by a danger of unfair prejudice or confusion.  The admission of the violations of Regulation O and bank policy would not unduly prejudice the defendant because these acts are no more inflammatory, sensational, or disturbing than the charged offense—indeed, the proffered evidence is direct evidence of the charged crimes, as set forth above.[4]

   b.  <u>Evidence of the Defendant's Violation of Bank Regulation and Policy is Admissible Pursuant to Rule 404(b)</u>

Evidence of the defendant's violation of Regulation O and bank policy is also properly admissible pursuant to Rule 404(b) in order to establish the defendant's opportunity, intent, and absence of mistake.  Fed. R. Evid. 404(b).  As discussed above, these violations bear directly on the defendant's intent.

---

[4] As noted above, any risk of undue prejudice can be addressed through an appropriate limiting instruction.

In addition, the relevant bank policy provides that a loan governed by Regulation O must be approved by the Bank's board of directors. *See* Indictment at ¶ 4. The defendant's violation of this policy is therefore also probative of the defendant's opportunity to commit the charged crimes. That is, the defendant's violation of the bank policy was integral to committing the crime because it allowed him to facilitate approval of the fraudulent loan without additional scrutiny from the Bank's board. Such evidence is also appropriate to rebut arguments that the defendant could not have acted with wrongful intent because his actions were subject to internal and/or external review and approval.

Finally, the evidence of the violations of Regulation O and bank policy are admissible as evidence of the defendant's absence of mistake. The defendant intentionally circumvented a federal regulation and the bank's credit policy in order to secure approval for the fraudulent loan. These violations are therefore admissible to establish that the defendant did not act negligently or absentmindedly in failing to disclose his interest in Loan-1, but rather, that his actions were part of a calculated scheme to defraud the Bank.

Accordingly, the proffered evidence of the defendant's violation of Regulation O and bank policy is highly probative and admissible as direct evidence of the charged conduct and, in the alternative, pursuant to Rule 404(b). *See Vaccarelli*, 2021 WL 4805218, at *2 (2d Cir. Oct. 15, 2021).

## III.   EVIDENCE OF THE LOSS TO THE FDIC AND BANK-2 IS RELEVANT AND ADMISSIBLE

The Government should be permitted to offer evidence at trial concerning the loss that the FDIC and the Bank's successor bank, Bank-2, suffered as a result of the defendant's fraudulent scheme. This evidence is relevant and similar evidence is routinely admitted at fraud trials. *See United States v. Copple*, 23 F.3d 535, 544-45 (3d Cir. 1994) (holding, in mail fraud case, that

evidence of loss was relevant even though it was not a required element because "[p]roving specific intent in . . . fraud cases is difficult, and, as a result a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent"). Indeed, "when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence." *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983); *see also United States v. Seabrook*, 814 F. App'x 661, 662 (2d Cir. 2020) (holding that admission of loss evidence is relevant to establish defendant's fraudulent intent to mislead concerning the risk of loss); *United States v. Munoz-Franco*, 387 F.3d 25, 62 (1st Cir. 2007) ("[C]ourts have repeatedly held that loss is relevant in fraud cases to demonstrate a defendant's knowledge or intent to commit fraud."). Evidence of loss is also relevant to proving materiality and an intent to influence, which are elements of the charged crimes. *See, e.g.*, *Seabrook*, 814 F. App'x at 662.

Here, evidence that Loan-1 fell into default is admissible to prove the defendant's fraudulent intent, intent to influence the Bank, and the materiality of his misrepresentations and omissions. Loan-1 should never have been approved. And but for the defendant's efforts and his and his co-conspirator's actions in bolstering Borrower-1's purported finances, it would not have been. That Loan-1 fell into default within approximately a year after it was issued is proof of the defendant's fraudulent intent and materiality. It helps to establish that the defendant facilitated the fraudulent Loan-1's issuance out of greed, without regard to Loan-1's viability, the Bank, or ultimate downstream victims. Accordingly, evidence of the losses sustained by the FDIC and Bank-2 should be admitted at trial.

IV.    **STATEMENTS OF FRIED AND OTHERS ARE ADMISSIBLE PURSUANT TO RULE 801 AS CO-CONSPIRATOR STATEMENTS AND STATEMENTS BY THE DEFENDANT'S EMPLOYEES WITHIN THE SCOPE OF THEIR EMPLOYMENT**

The Government expects to introduce testimony and records containing statements made by other co-conspirators in furtherance of the charged scheme.  *See* Fed. R. Evid. 801(d)(2)(E). As discussed above, the defendant had a number of co-conspirators, including Aron Fried and CC-1.  In addition, the Government expects to introduce testimony and records containing statements made by the defendant's employees within the scope of their employment relationship as statements of a party-opponent.  *See* Fed. R. Evid. 801(d)(2)(D).  For each category of statements, the Government has provided examples below, which are intended to be illustrative, not exhaustive.

A.  **Applicable Law**

1.    Statements by an Agent or Employee

Federal Rule of Evidence 801(d)(2)(D) governs statements by a party's agent or employee, and provides that:  "A statement is not hearsay if ... [it] is offered against a party and . . .  was made by the party's agent or employee on a matter within the scope of that relationship and while it existed...."

As the Second Circuit has noted, the admission into evidence of such statements is not subject to many of "the technical prerequisites of other evidentiary rules" and "should be granted freely."  *Pappas v. Middle Earth Condo. Assoc.*, 963 F.2d 534, 537 (2d Cir. 1992).  The reliability of admissions by a party's employee is grounded on two premises: first, that "an employee is usually the person best informed about certain acts committed in the course of his employment," and second, "that while still employed an employee is unlikely to make damaging statements about his employer, unless those statements are true."  *Id.*

A party seeking to introduce a statement under Rule 801(d)(2)(D) must establish: (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency. *Id.*

  2. Co-conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Under Rule 801(d)(2)(E), "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." *United States* v. *Ulbricht*, 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing *United States* v. *DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993)); *see also United States* v. *Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment"), *cert. denied sub. nom. Ramirez-Talavera* v. *United States*, 501 U.S. 1211 (1991).

When determining whether the predicate conspiracy has been established, the district court is not bound by the rules of evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider

the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States* v. *Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily* v. *United States*, 483 U.S. 171, 181 (1987)).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United* States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *Untied* States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *United* States v. Diaz, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United* States v. *Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d at 813; *see also Dresna*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted). For example, in *United States v. Lozano-Reyes*, the Second Circuit affirmed the trial court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits." *United States* v. *Lozano-Reyes*, No. 95-1707, 1996 U.S. App. LEXIS 14182, at *5 (2d Cir. June 12, 1996).

### B. Discussion

The Government anticipates offering testimony and records containing statements made among the conspirators in furtherance of the conspiracy. For example, the Government expects that its case-in-chief will include evidence, in substance and in part, that: (1) Fried informed CC-1 that he had a "friend" at the Bank, that is, Zilberg, who could get a loan approved quickly for CC-1; (2) Fried told CC-1 that, if asked, the Straw Borrower needed to tell Bank personnel that Loan-1 was for an investment in the Straw Borrower's own business; and (3) Fried told CC-1 that Zilberg would receive a portion of the Loan-1 proceeds, consisting of approximately one-third, or $466,000, as a favor for helping to obtain Loan-1. These statements were plainly intended to further the fraudulent scheme by, for example, relaying instructions to the Straw Borrower to facilitate the fraudulent Loan-1 to promote or facilitate achievement of a goal of the ongoing conspiracy, *see Rivera*, 22 F.3d at 436, and also provided an update as to the status or progress of the conspiracy, *see Desena*, 260 F.3d at 158.

In addition, the Government expects to offer testimony and records containing statements made by the defendant's employees. For example, the Government's case-in-chief will include

evidence, in substance and in part, that on or about September 11, 2009, the defendant's assistant supplied Employee-1 with documents purporting to show additional income for the Straw Borrower to support Loan-1, and stated, in substance and in part: "Mr. Zilberberg sends the following documents and asks if you would return reply with a funding date please," Indictment at ¶ 9(d).   Statements by Zilberberg's employees are admissible as a statement of the defendant's "agent of employee on a matter within the scope of that relationship and while it existed."  *See* Fed. R. Evid. 801(d)(2)(D); *see United States v. Mercado*, No. S1 02 CR 675 WHP, 2003 WL 21756084, at *7 (S.D.N.Y. July 30, 2003) (admitting statements made by the defendant's former counsel, in his capacity as the defendant's attorney, to representatives of a bank allegedly defrauded by the defendant, pursuant to Rule 801(d)(2)(D)).

## V. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT CONCERNING VICTIMS' NEGLIGENCE

The Court should preclude evidence or argument that seeks to blame the Bank for the defendant's fraud scheme.

It is settled law that "an innocent crime victim has no duty to detect a crime being perpetrated against it." *United States v. Holland*, 394 F. App'x 766, 768 (2d Cir. 2010).  Therefore, the Second Circuit has repeatedly recognized that "a victim's negligence is not a defense under the federal fraud statutes." *United States v. Frankel*, 682 F. App'x 20, 22 (2d Cir. 2017).  For example, in a case involving a mortgage fraud scheme, it was no defense that the victim lender "could have discovered based on external sources that the representation [in the loan application] was false," because the victim's "lack of sophistication is not relevant to the intent element of mail or wire fraud." *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007); *see also United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (lender's negligence also "irrelevant to the materiality of [the defendant's] false statements").  And in a prosecution for inducement of travel for a fraudulent

purpose, the Second Circuit affirmed the district court's decision to restrict cross-examination into the victim's "vigilance (or lack thereof)" in his dealings with the defendant, firmly "reject[ing] [the defendant's] argument that the foolishness of [the victim's] belief in [the defendant's] fraudulent scheme somehow vitiates [the defendant's] fraudulent intent." *United States v. Thomas*, 377 F.3d 232, 241, 243 (2d Cir. 2004).

These principles have also been applied to other fraud prosecutions. *See, e.g., United States v. Ahmed*, 14 Cr. 277 (DLI), 2016 WL 8732355, at *4 (E.D.N.Y. June 24, 2016) ("Defendant may not argue that he did not intend to defraud Medicare because Medicare paid his claims, negligently or otherwise."); *United States v. Lesniewski*, 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013) ("[A]ny evidence proffered by Defendants for the purpose of establishing that the [United States Railroad Retirement Board] was negligent or careless would be irrelevant to the inquiry of whether they possessed the requisite intent to commit the fraud at issue in this case"), *aff'd*, 614 F. App'x 542 (2d Cir. 2015); *United States v. Nekritin*, 10 Cr. 491 (KAM), 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011) (precluding defense from "arguing or presenting evidence that Medicare and Medicaid's payment of their claims is a defense to health care fraud").

Here, the defense should be precluded from introducing evidence, or otherwise arguing, that the victims of the defendant's scheme was negligent in failing to investigate and detect the defendant's fraudulent conduct. Likewise, the Court should reject any argument or suggestion that there can be no fraud if the victims acted in an objectively unreasonable manner. The defendant should not be permitted to blame the Bank for failing to detect the scheme. Under settled Second Circuit precedent, such defense theories are improper because the reasonableness of the victim's response to a fraudulent scheme is irrelevant. Therefore, this Court should preclude any defense based on such an "unreasonable victim" or "blame the victim" theory.

## VI.   EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S FAMILY BACKGROUND, HEALTH CONDITION, AGE, OR ANY OTHER PERSONAL FACTORS UNCONNECTED TO GUILT SHOULD BE PRECLUDED, AS SHOULD DISCUSSION OF PUNISHMENT

The Government is unaware of any lawful basis for the defendant to offer evidence or argument concerning his family background, health, age, or any other similar factors.  He should be precluded from doing so, and from mentioning such subjects in his opening statement, absent a showing that such factors bear on guilt.  *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. S9 05 Cr. 774, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted.  Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion."  *Id.*

## VII.  EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANTS' PRIOR COMMISSION OF "GOOD ACTS" OR NON-COMMISSION OF OTHER BAD ACTS SHOULD BE PRECLUDED

To the extent that the defendant may seek to present evidence or argument concerning his commission of "good acts," including any philanthropic giving or other similar deeds, or to offer evidence of non-criminal activities to seek to disprove his guilt, he should be precluded from doing so.  Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions."  *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990).  Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait of character," or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense.  *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. S2 11 CR 873, 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012), ("a defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014); *United States v. Rivera*, No. 13 Cr. 149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving).  The defendant should accordingly be precluded from offering evidence or argument, including in his jury addresses, concerning any charity, philanthropy, or any other specific instance or instances of prior good acts, or the lack of commission of other bad acts.

29

## <u>CONCLUSION</u>

For the foregoing reasons, the Government's motions *in limine* should be granted.


Dated:  New York, New York
        November 17, 2022

                                      Respectfully submitted,

                                      DAMIAN WILLIAMS
                                      United States Attorney

                          By:    s/_____
                                      Dina McLeod
                                      Daniel G. Nessim
                                      Kimberly J. Ravener
                                      Assistant United States Attorneys
                                      (212) 637-1040/ -2486/ -2358

30