Clayman Rosenberg
Kirshner & Linder LLP

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

April 10, 2023

BY ECF
Hon. George B. Daniels
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

Re: United States v. Aron Fried, 19 Cr. 802-002 (GBD)

Dear Judge Daniels,

We are the attorneys for Aron Fried.  Mr. Fried comes before this Court having pled

guilty to conspiring to commit bank fraud, in violation of Title 18, United States Code, Section

371.  Sentencing is scheduled for April 18, 2023.  We submit this letter on behalf of Mr. Fried in

anticipation of sentencing and to provide the Court with insight into how and why Aron finds

himself before your Honor.  Nothing submitted in this letter is in any way intended to diminish

or detract from the seriousness of his offense or his complete and unconditional acceptance of

responsibility for his conduct.  Aron's deep remorse and acceptance of responsibility for what he

has done are unqualified. (See Ex. A: Letter from Aron Fried). He simply asks that this court

understand the whole person that he is: not just the defendant who has pled guilty to this crime,

but a devoted husband and father, a source of support to an extended "family" of people in his

community who he has devoted his life to helping, and a man who has spent the past several

years battling aggressive cancer. He asks the court to see him as he is and craft a sentence accordingly.

## Procedural History

On November 12, 2019, Mr. Fried was arrested and charged with conspiring to commit bank fraud in violation of Title 18, United States Code, Section 371, as well as other related charges. He was released on bail the same day to be supervised by Pre-Trial Services. On November 15, 2022, Mr. Fried pled guilty to the bank fraud conspiracy charge alleged in a one count superseding Information pursuant to a plea agreement. Mr. Fried has been fully compliant with all bail conditions since his release in November 2019.

### Offense Conduct

The conspiracy charge in the indictment and in the superseding information alleged that Aron, his co-defendant and lawyer, Mendel Zilberberg, and the informant, Abraham Kahan, conspired to obtain a loan from Park Avenue Bank (PAB) knowing that false information would have to be provided to the bank in order for the loan to be obtained. While Aron has acknowledged that he knew misrepresentations would be made to PAB in order to obtain the loan, his actions must be understood in the context of his motive, his intent, and his conduct after the borrowers obtained the loan proceeds.

Aron's intention and belief was that Herschel Sauber, the named borrower and an associate of Abraham Kahan, would receive the loan proceeds and would then lend those proceeds to Kahan. Kahan would retain some of the proceeds and loan the balance to Aron. In turn, Aron would loan some of the proceeds to Mendel Zilberberg, an attorney who represented Aron and who was a director on the Board of Directors of PAB. Aron viewed these loans as real in the sense that these individuals were obligated to each other and ultimately to Mr. Sauber, who

was obligated to PAB. As described below, Aron repaid Kahan the amount that he received, but Kahan did not repay Sauber or the bank. Rather, he appears to have kept the loan proceeds for his personal use. Had Kahan acted in conformity with his agreements with Aron and Sauber, the Bank would not have suffered a loss. Aron is the *only* one who accepted the responsibility of repaying the loan. While this does not relieve him of responsibility for participating in a conspiracy to provide false information to the bank, it was never his intention for the bank to suffer any loss as a result of the loan.

Aron's decisions came at an extremely stressful and uncertain time in his life. From 2005 to 2009, Aron was a partner at a home health agency called Renaissance Home Health Care. In 2009, his business partner suddenly and wrongfully forced him out of the business. Aron's life was upended. In an instant, he went from a stable job in a career that embodied everything he cared about, to being jobless and needing to find a lawyer to contest his unlawful termination. Aron retained Mendel Zilberberg to represent him in the litigation against Renaissance and his former partner.

Facing the prospect of costly litigation and an uncertain future, Aron also decided to leverage his extensive experience to start his own home health care company. But, facing the sudden and unexpected loss of his livelihood and the possibility of years of no income and expensive legal fees ahead of him, he needed financial assistance quickly. Zilberberg offered to advise and help Aron purchase his own business, including finding sources of funding. Initially, Zilberberg focused on private financing sources for Aron, but eventually proposed assisting him in obtaining financing at PAB, where Zilberberg told Aron he had influence.

Aron spoke to Abraham Kahan about his desire to start a new home healthcare company and his need for funding. Aron knew Abraham Kahan from the community and the health care

industry. Kahan expressed interest in investing in Aron's new business.  Aron was aware that Kahan would be unable to obtain a loan in his name because of his prior felony conviction, so Aron was not surprised when Kahan recruited Sauber to be the named borrower for the loan. Aron introduced Kahan to Zilberberg, but, having introduced them, Aron relied entirely on Kahan and Zilberberg to determine how to obtain the loan.

Aron understood that Sauber would loan the funds to Kahan, who would take a portion of the funds for his own use and loan the rest to Aron. Zilberberg requested, and Aron agreed, that Aron would also loan Zilberberg a portion of the money Aron received from Kahan. The end result was that Aron would be able to purchase his own home health care company.

Aron understood that PAB was not going to be informed of how the loan proceeds were going to be used.  He also admits to aiding this plan by opening up an account at the Bank, authorizing the transfer of funds from Mr. Sauber to this account, giving Mr. Kahan blank checks from the account to use as he saw fit and, of course, by taking loan proceeds to start his own company.

 Aron always intended for the loan from PAB to be fully repaid; indeed, Aron paid back more than what he personally received.  He treated this arrangement between the parties as a real loan and he fully expected everyone to fulfill their financial responsibility by repaying with interest their portion of the loan.  In other words, Aron expected to repay Kahan, who was to repay Sauber, who was to pay PAB.

Aron's understanding that the parties had loan obligations to each other and ultimately to the bank was reinforced by the fact that Zilberberg insisted that before any monies were disbursed, all the borrowers would be required to execute a "Heter Iska," a formal Jewish contract for the repayment of a loan.  Thus, Sauber entered into a Heter Iska with Kahan, Kahan

with Aron, and Aron with Zilberberg. Within the Orthodox Jewish community, charging interest on a loan extended to another Jew is forbidden. The Heter Iska is essentially a "work around" that enables Orthodox Jews to complete a transaction and avoid the prohibition against charging interest.  It is also a commitment guided by the religious laws of Aron's community and developed by religious leaders.  Aron believed these religiously prescribed obligations were genuine and binding.

Aron also believed that Kahan's decision to sign the deed of his house over to Sauber was a sign of Kahan's intent to repay Sauber. Aron believed this transfer was collateral for Kahan's own loan from Sauber. Similarly, Zilberberg also provided Aron with a deed to the building housing his own law firm. While the government has suggested that Kahan's transfer of the deed was intended to deceive the bank, to Aron, it was a way for Sauber to ensure Kahan's repayment of the loan.

Consistent with Aron's understanding that he was obligated to Kahan for the money he borrowed, he repaid all the money that he received.  Aron repaid to Kahan, or to third parties at Kahan's request, all the money Aron borrowed for the acquisition of the healthcare business, Emanuel, but also the money that Aron loaned to Mendel Zilberberg, with interest. Aron, through his accountant, kept a running tab of what he owed and how and when he repaid Kahan. These included cash payments, payments for Mr. Kahan's car and health insurance, and other expenses. And they included $400,000 that Aron repaid directly to Valley National Bank (VNB), the bank that succeeded PAB after it became defunct. Aron kept up these repayments from the inception of the loan through 2013, keeping meticulous track of them. The spreadsheet showed Aron repaid Kahan everything he owed, and then some, approximately $993,000. This included

interest, set at an equivalent rate to the interest on the PAB loan to Sauber. Aron treated his loan obligations, down to the interest rate, as legitimate, and repaid them accordingly.

Aron is the only one of the borrowers who paid back the bank. Aron had more than paid back Kahan the funds that he utilized to purchase his business even before VNB sought repayment from Sauber. However, when the loan defaulted and VNB came after Sauber for the outstanding balance, Aron realized that neither Kahan nor Zilberberg had repaid any of their portion of the loan. Although Aron had already repaid more than he received for the purchase of Emanuel to Kahan, he understood that he was responsible for Zilberberg's portion as well. He therefore paid $400,000 directly to VNB which, as he understood, represented the remainder of his obligation to Kahan on behalf of himself and Zilberberg. Aron's accountant sent his spreadsheet to Mr. Kahan on Aron's behalf on February 16, 2012, around the time of Aron's final payment to VNB. It reflected the fact that Aron repaid nearly a million dollars to Mr. Kahan and VNB, and therefore had fully repaid his obligation, and more, to Kahan.

Mr. Fried accepts full responsibility for his role in this scheme. But if everyone acted as he did, the loan would have been repaid in full, with no loss being incurred by the bank. Mr. Fried helped deceive the Bank about the purpose of the loan, but his repayment of more than what he borrowed was a clear demonstration that Aron's intention was not to harm the bank. His wrongful conduct should be properly considered in the context of his situation and the actions he took afterward.

## FEDERAL SENTENCING LAW

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Underlying that tradition is "the principle that the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quotation and citation omitted).

One procedural requirement of any federal sentencing is that the sentencing court properly calculate the applicable Guidelines range.  But, as this Court well knows, the Guidelines are only a "starting point" and an "initial benchmark"; courts "may not presume that the Guidelines range is reasonable" or that "extraordinary circumstances" are necessary to 'justify a sentence outside the Guidelines range." *Gall v. United States*, 552 U.S. 38, 47 (2007).  Simply put, the Guidelines are advisory, not mandatory.  *See United States v. Booker*, 543 U.S. 220 (2005); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (recognizing that it is "emphatically clear that the Guidelines are [indeed] guidelines—that is, they are truly advisory," and to this end, "[a] district court may not presume that a Guidelines sentence is reasonable [and] must instead conduct its own independent review of the sentencing factors"). This Court stands as the sole arbiter of a just and proper sentence, empowered and required to "make an individualized assessment" of a fair sentence pursuant to the factors presented in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 50.

Although this Court must consider the Guidelines in fashioning a sentence, it is ultimately bound to "impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotation marks and citation omitted) (emphasis added).  We respectfully submit that if this

Court fashions a sentence by relying solely or even principally on the Guidelines in this case, it would result in a sentence that far exceeds what is necessary or sufficient.

"[T]he Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (citation omitted). This is just such a case. The Guidelines range applicable here, like most fraud causes, is driven principally by the amount of the loss. Notably, the loss at issue here is actual, as opposed to the intended loss. As discussed above, Aron did not intend for PAB to lose any money at all, and acted in good faith to repay his obligations as he understood them. Although it in no way changes Aron's complete acceptance of responsibility, it is important to note that, had the other actors behaved as Aron did, PAB would have been fully repaid.

While the Court must consider the Guidelines, we respectfully submit that this Court should "place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of th[is] case and of [Mr. Fried,] the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515.

As discussed in greater detail below, we also ask the Court to account for the need of medical care, 18 U.S.C. § 3553(a)(2)(D), and to consider Aron's Physical Condition under U.S.S.G. § 5H1.4. A departure under U.S.S.G. § 5H1.4 is warranted for physical impairments that are so "extraordinary" that "the ordinary purposes of incapacitation and deterrence of recidivism do not justify the expense of extended incarceration." *United States v Jimenez*, 212 F.Supp.2d 214, 217 (SDNY 2002). If the Court finds, as we respectfully submit it should, that

Mr. Fried's medical conditions warrant a lesser sentence than otherwise must be accounted for in his sentence, then it should fashion a sentence that furthers that purpose.

**ARON FRIED**

### Aron Fried's Family Background

Aron Fried is fifty years old. Aron and his siblings were raised by his parents, Edward and Magda Fried (nee Farkas) in the Orthodox Jewish community of Williamsburg, New York.

Aron's parents were Holocaust survivors. As Aron's older brother Michael describes it, "They made their way up in life with strength that is beyond our comprehension." (Exhibit C: Letter from Michael Fried). Edward Fried was born in Halmi (or Holmin) in Romania in 1932. One of eleven children, he was a young boy when his family was sent to a concentration camp near Vienna, Austria. His father, Aron's grandfather, died in the camp. Near the end of the war, Edward's older brother was shot and killed on a forced march as the Nazis emptied the camp. The surviving family members eventually made their way to Brooklyn, where Edward and his older brother supported their mother and nine siblings.

Aron's mother Magda was born in Hodasz, Hungary in about 1940, one of nine children. Miraculously, her whole family survived the war by hiding in the forest near their village. Afterward, they emigrated to Israel, where Magda's mother died shortly after they arrived. After her father remarried and her older siblings moved away, Magda was placed in an orphanage where she remained until she was about eighteen. Edward and Magda met through a matchmaker and moved to Brooklyn to marry and start a family. They had eleven children: Arthur, Sam, Michael, Sheldon, Meir, Jerry, Nathan, Aron, Irving, Esther, and Malky.

Aron's older brother Michael speaks fondly of his parents, who "were wise, intelligent people who raised and guided us along the paths of honesty, faith and true values." Surely, they

tried to provide the best possible life for their family. All the same, Aron did not have an easy childhood. By the time Aron was born, his parents were worn down by their difficult early years as holocaust survivors and decades of hard work to provide for multiple generations of family members.  As a result, they had little energy for, or connection to, Aron. He was raised as much by his older siblings as his parents. His rigorous religious upbringing, and the similar trauma shared by many members of that community, meant that Aron also did not find much emotional support from other authority figures in his life. Pearl Flax, Aron's therapist, describes how even though Aron was provided for, his early years were also characterized by little emotional warmth or connection. (*See* Exhibit K: Letter from Pearl Flax). Notably, many details about his parent's lives come from Aron's older siblings, not his own recollection.

Edward and Magda's difficult lives took a toll on them. Edward had his first heart attack at 52, and Aron recalls that he suffered from health problems through the rest of his life. In 1998, at the age of fifty-four, Magda was diagnosed with melanoma and died within a few months. That same year, Edward underwent a heart transplant and died of the resulting complications at age sixty-four. In a few months, Aron and his siblings were orphaned. His brother Michael writes about the "tremendous loss" this large, young family faced. Aron, who even then was a "sensitive and compassionate type" took their loss especially hard. (Ex. C). Given the health troubles he and his wife have suffered in the past few years, the sudden loss of both parents has weighed particularly hard on Aron, who cannot help but see it as foreshadowing his own struggle with cancer.

Aron attended school at Ohr Torah yeshiva through high school. He did not attend college. At the age of twenty, a matchmaker introduced him to his wife, Sandra and they were married on January 6, 1993. Aron and Sandra have five children: Faigy, Jeremy, Isaac, Charna,

and C.F., and four grandchildren. Aron and Sandra moved to Borough Park and Aron went to work for a time in his father-in-law's grocery before returning to the family restaurant. A chance meeting with a customer in the restaurant led to a job offer in a home healthcare business. Aron has spent the rest of his career in home healthcare. As the letters from friends and colleagues attest, there could not be a better fit for someone with Aron's generous, compassionate nature.

### Aron's Generous Nature

The letters from friends and family show that Aron is devoted to his immediate and extended family. But they also show that Aron's "extended family" extends to his community. He freely gives his time, financial resources, and emotional support to anyone in need.  His home is literally always open to those who need a haven, a safe place to stay, a clean bed, a good meal and compassion. The letters show Aron's nature: a man who instinctively sees the good in people, who is empathetic, and who has a natural urge to help others in need..

Aron is a devoted husband and father. His sons Jeremy and Isaac write movingly about how Aron has always made time to be in their lives, putting time with them over work and other obligations. (*See Generally* Exhibit D: Letter from Jeremy Fried *and* Exhibit E: Letter from Isaac Fried). Aron's older brother Nathan, the seventh of eleven children, writes how Aron has always been generous. ██████████████████████████████████████████ Aron opened his home to Nathan's family and made sure they felt loved and supported during the important Passover holiday. Aron went further, reaching out to his healthcare connections to get updates on Nathan's condition to his family and ensure he received the best treatment possible. Nathan's gratefulness for Aron's support could not be clearer: "I am sure I am alive today because of him." (Exhibit F: Letter from Nathan Fried).

Aron is as generous with his financial resources as with his time. His son Jeremy describes how Aron sold off a portion of his rare coin collection, an inheritance from his own father, to pay for his daughter-in-law's share of Jeremy's wedding so that their family would not have to strain their own resources. Dov Bleich, Aron's nephew, describes how both he and his wife, Aron's niece, came from "broken" homes and how Aron took them "under their wings and adopted us as their own." (Exhibit G: Letter from Dov Bleich). Because Dov and his wife did not have support from their own families, Aron and his family helped plan and pay for their wedding. As Dov puts it, "they provided an emotional cocoon to protect us from the chaos around us and provided for us in a way that would be impressive even if we were their own children." Their relationship is so close that Dov's children, Aron's great-nieces, call him "Zeidy," or grandpa, in Yiddish. (Ex. G).

Aron's generosity is not limited to his family. Brany Rosen is Director of Member Services at ATIME, or A Torah Infertility Medium of Exchange, an international organization to help families coping with infertility and pregnancy loss. She has known Aron since 2008, and describes him as a "man genuinely devoted to helping others." (Exhibit H: Letter from Brany Rosen). She describes all the ways Aron has worked on behalf of ATIME, whether fundraising, identifying clinical treatments, or even driving patients to get treatments hours away.

Katrina Cortes, Aron's longtime employee and assistant at Emanuel, is a single mother of three children. She describes how during difficult financial times, Aron "came through for me. He always made sure that I was able to pay my rent and keep food on my table." (Exhibit I: Letter from Katrina Cortes).

Rabbi Shaul Rosen leads Congregation Bais Hamedrosh Oheiv Yisroel Chasidai Ziditshov in Toms River, New Jersey, where Aron is a congregant. Besides Aron's observant

practices and devotion to the congregation, Rabbi Rosen writes how he has often observed Aron

helping people in need without seeking acknowledgment or honors, but merely because it is the

right thing to do.  (*See* Exhibit J: Letter from Rabbi Shaul Rosen).

Pearl Flax, Aron's therapist for the past three years, writes how Aron has paid for therapy

for other members of the community because he thought they would benefit from it, a quietly

significant act in a community that is often uncomfortable with therapy. And she recounts

hearing about Aron's quiet generosity from others:

> Someone shared with me without him knowing that he put together
> funds for some families in the community that were struggling to
> pay for their groceries. During Covid he found out some people
> were stuck home and unable to get food or medications and he
> would make arrangements for them to get their food packages and
> pharmacy deliveries. He does all this quietly and very
> unassumingly.

(Ex. K).

Rabbi David Lieberman is the Rabbi of Congregation Pnei Miven Shenya in Brooklyn,

where Aron was a long-time congregant. For Rabbi Lieberman, Aron was not just a devoted

congregant, a "pillar of our community" and a "most important asset" to the synagogue, but he is

first and foremost "a wonderful man who goes out of his way to help others." (Exhibit L: Letter

from Rabbi David Lieberman). Rabbi Lieberman can attest to this personally. He describes the

challenges he and his family have faced ███████████████████████. One year,

the Rabbi was unable to secure a spot in a special needs summer camp for her, which was

incredibly important both for her well-being and for the family's. When Aron heard about this,

he dedicated himself to finding a place for her, even driving out to the Catskills himself to search

for an appropriate spot. Aron did similar work on behalf of another congregant, helping him to

find the right school for his disabled daughter. (*See* Ex. L).

The letters from Aron's friends, family, and coworkers show that Aron has always been generous with his time, resources, and background in health care to help those in need. For as long as Aron has been able to help others, he has done so, simply because that is who he is.

### Aron is a Source of Support for Young Men in His Community

Nowhere is Aron's generous spirit clearer than in the way he helps struggling young men in his community. Although his Orthodox Jewish community is extremely close-knit and supportive, many families face financial struggles and difficulties raising their children that are compounded by pressures from outside the community, like drugs. Beyond unstintingly supporting his own family, Aron's home is open to other young members of the community who are in need.

According to Aron's eldest son Jeremy, "countless" friends have stayed at Aron's home when they were struggling with their own families. Isaac Fried, Aron's younger son the third of five children, describes his home growing up:

> I would wake up any random day and find a friend of my brothers or sisters in my house. Everyone had a story, I don't know how my parent were magnets to these types of children and adults, anyone with any kind of problem knew my dad will go to the end of the earth to help anyone, it was who he is and he never got tired. Our home was not that big but we always found place. He wasn't that rich but he always had what to give. My father never had fancy cars or vacations for himself, his joy is giving to others.
>
> (Ex. E)

Aron's hospitality is well known in his community. As Rabbi Liberman describes it:

> Ari has an open home, and many needy have been helped through Ari. He invites people in all emotional states of mind, those that most of us would not go near, and he offers them food to eat and a place to rest. Ari has that wonderful intuition to know just what to do and when to do, and how to do it in the most wholesome way.
>
> (Ex. L)

Israel Hecht is a mentor for troubled youths in the Orthodox Jewish community. While this is Mr. Hecht's career, he writes how Aron a kindred spirit who does the same sort of work solely out of the kindness of his heart:

> Aron has an open home for troubled kids as well. Everyone is welcome in his home. I have witnessed him have boys stay at his home numerous months at a time. He doesn't get paid for this. It's out of the goodness of his heart. He talks to these boys, sits with them at dinner, makes BBQ's, and anything to make them feel loved, without being judged. He shows these kids that there are people out there who care for them, he makes them feel "normal"! He has helped numerous kids get back on their feet, encouraging them to keep their jobs or get jobs and lead productive lives. They respect Aron for all he does, and don't want to disappoint him, so we get many of them back on track, just by being the daddy these kids don't have.

(Exhibit M: Letter from Israel Hecht)

Nate Rosenblum is one of the many young men who have benefited from Aron's care and compassion. Nate, who is now 19, is a friend of Aron's children. He dropped out of school at fourteen and ███████████████████ and his parents kicked him out of their home.  When Aron heard about Nate's problems, he took Nate into his own home, treated him like a member of the family, and offered him a safe, comfortable space when even his own family could not take care of him. ███████████████████, rather than kick him out Aron spent his own money, which he had set aside for a family vacation, to get Nate treatment. As Nate puts it, Aron "literally saved my life." (Exhibit N: Letter from Nate Rosenblum).

Israel Kaufman has known Aron for over fifteen years as his accountant and speaks highly of Aron as a member of the community, as a businessman, and as an employer. He also writes about Aron's relationship with his nephew, a connection the two did not realize they shared until much later:

Aron has undertaken to mentor and be a 'big brother' to my nephew who has by now had a remarkable turn-around and is a success story. But at that time, he was a troubled high school dropout. After getting to know him at an event Aron and his wife opened their home for him, listened to him, supported him, encouraged him, and made him feel special. Aron and I only figured out there was a connection much later -- when he was already considered family in the Fried's home.  Apparently, this is a rather often occurrence in the Fried home. Many a troubled youth has found comfort and meaning with them. They return again and again and are encouraged to bring their friends as well. In our family it is without doubt that Aron played a huge role in my nephews' success story.

(Exhibit O: Letter from Israel Kaufman)

As with so many of these stories Aron did not support Mr. Kaufman's nephew for personal or professional gain. Aron simply did it because helping people who have nowhere else to turn is second nature to him.

## Aron's Career is an Outgrowth of His Compassionate Nature

Aron has spent the better portion of his life in home healthcare. Although he came into the field by chance, home healthcare is clearly not just a way to earn a living but reflects his generous spirit.

Aron Goldberger is Chief Operating Officer of Excellent Home Care, a skilled services Home Care Agency. Mr. Goldberger describes how Aron mentored him when he was new to the field, and how Aron cares about Emanuel's patients:

His character was displayed by always helping others himself. I recall discussing with Ari his contingency plans during a snowstorm where even Mass Transit was halted. While we were discussing the logistics of getting clinical personnel to the patient's homes, Ari casually mentioned that he would be driving Aides himself to homes of patient's who lived alone! Similarly, he would frequently answer phone calls of anxious parents of children with special needs, engaging in untold hours of phone conferences with physicians and others involved in their care. Ari was never one to delegate to the "relevant director of department" in question.

(Exhibit P: Letter from Aron Goldberger)

Mr. Goldberger also writes of Aron's integrity and honesty. He describes how, in 2017, Excellent Home Care made an unnoticed error resulting in an overpayment to Emanuel. Not only did Aron immediately point this out, but he spent his own time with Excellent's accounting team to determine the right numbers. Mr. Goldberger sums up Aron—his mentoring, his enthusiasm for the job, his care for patients, and his honesty—in a simple phrase: "he is a good man." (Ex. P).

Dora Maniyeva is an employee of Emanuel Services and has worked alongside Aron at three different home health agencies over the past eighteen years. She explains that "[Aron] enjoys home care because he genuinely enjoys helping people. Ari was always on the phone helping people, speaking sometimes to people for hours on end. Listening, giving advice, offering help, finding resources. He is relentless in making sure that all patients and families are taken care of to the best of his ability." (Exhibit Q: Letter from Dora Maniyeva).

Katrina Cortes is Aron's assistant at Emanuel. She has worked with him since 2005 across two different home health agencies and describes how Aron will personally deliver needed supplies to patients, or simply come to see them because the patient asked him to visit. She describes the "countless hours" Aron spends on the phone working with and comforting patients and their families. (Ex. I).

In an industry in which high turnover is common, Dora Maniyeva, Katrina Cortes and his colleague Nathan Jacobowitz, have all worked with Aron for over a decade. (*See Generally* Exs. I, Q; Exhibit R: Letter from Nathan Jacobowitz). The length of these relationships reflects their admiration and respect for Aron as a health care provider and their appreciation for Aron as an employer.

**Aron Fried's Cancer Diagnosis**

---

[1] Aron's Comprehensive Medical Records, which Dr. St. George reviewed in making his assessment, are attached as Exhibit U. Given the sensitive and voluminous medical information contained therein, unredacted copies of Dr. St George's letter and Aron's Medical Records are only provided to the Court and to the government.









### Aron's Arrest and this Case Have Taken a Further Toll on Him and His Family

Aron's family was traumatized ████████████████████████████.  The events that followed made their lives even more difficult.  In 2019, ███████████ ████████████ ██████████████████████████████ ████████████████████████ ████████████████████████████ ██████████████████████████████████

A week before ██████████ FBI agents raided Aron's home in the early morning hours. The agents trained guns on Aron's son Isaac, who was sitting in his car in the driveway on the way to work. Aron's youngest son C.F. opened the door and was confronted by armed agents. Two agents each watched over Aron's family members as he was arrested. It should be noted that prior to Aron's arrest, counsel communicated to the U.S. Attorney's Office Aron's

willingness to voluntarily surrender to authorities in the event he was charged. Rather than allow

this non-violent, first offender the opportunity to avoid the trauma that was visited on his family,

the FBI insisted on a full show-of-force early morning raid on the Fried home.

Since the morning of the arrest, C.F. developed a stutter which continues to this day.

Isaac describes the terrible anxiety he suffered after the arrest that led him to abuse drugs. He lost

his job and spiraled into drug addiction. Although he is now sober, Isaac is still unable to stay in

his parents' home for any extended period of time, as it reminds him of the arrest and triggers his

anxiety. (*See* Ex. E). After all the years in which Aron worked so hard to shelter and support

young men in his community facing family discord, having his own son spiral into drug

addiction as a result of his arrest was a tremendous blow to Aron.

Those closest to Aron see the toll this has taken on him. His brother Michael describes

him as "utterly broken" by guilt. (Ex. C). His son Jeremy also describes the toll:

> My father is shattered. He is a broken man. He is constantly telling
> me how he lives with this pain of letting us down and hurting my
> mother and his children. He regrets his actions immensely and
> wishes he can turn back the clock and do things differently. He is
> missing work by going to therapy to help him so that he can
> continue being a father and husband without falling into a deep
> depression. My father used to be the life of our family, our
> extended family, and our growing community. He now sits quietly
> on the side. He is ashamed.
>
> (Ex. D).

In the words of those who know him best, the last few years of illness, arrest, and the

shame for his conduct have taken a toll on Aron and aged him beyond his years.

**<u>Aron Fully Accepts Responsibility for his Actions</u>**

Aron's acceptance of responsibility is unqualified. To be sure, his co-conspirators

Abraham Kahan and Mendel Zilberberg shepherded the loan through PAB and pocketed its

proceeds without making any of the genuine, good faith efforts Aron made to repay the loan or treat it as such. But Aron completely accepts his responsibility for his role. As part of his plea agreement with the government, he has admitted to the forfeiture allegation contained in the Superseding Information.

Aron's own words reflect the guilt and shame his actions have caused him, feelings that are evident to those around him. At a time when his family needed him most, ███████████ ███████████████████████████████████████████ his actions caused his family to undergo even worse suffering. Aron writes that he has failed his parents, who lived their lives with honesty and integrity. He has failed his wife, who has done so much for him and his family. He let down his family, friends, and community. His "regret is so great that no paper can absorb it." (Ex. A). Now, Aron simply wants accountability for his actions, to begin to make things right.

Aron has spent the last few years since his arrest reflecting on his actions and working to become a better man. The letters from his friends and family show he has absolutely repented and acknowledged his guilt to those closest to him, despite the shame he feels in doing so. He has realized that he needs to confront issues from his past, including his upbringing, his illness, and his responsibility for his crime, so that he can continue to be there for his family and community. For the past three years, he has gone to therapy weekly which, as his therapist Pearl Flax writes, is notable not only because he sought treatment for the first time late in life, but also because he's done so despite the taboos around therapy that are prevalent in the Orthodox Jewish community.  Aron spends much of their time together "seeking guidance and support on how to be a better father to his children, a better husband to his wife, and how to support them during this difficult and overwhelming time." (Ex. K).

Aron wishes, but knows he cannot, turn back time. He will spend the rest of his life

working to overcome the shame of his actions and the harm they caused his family.

### CONCLUSION

████████████████████████████████████████████████████████████████ His

arrest, and the guilt he lives with every day, have taken a further toll on him. Aron has always

tried to live a life of integrity, generosity, and caring for others. He is ashamed of his actions

here, which are so contrary to those values. ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Aron lives every day with the knowledge that he committed a crime. His conduct was a

grievous mistake, but also an aberration in a lifetime of upright generosity. A prison sentence

would be painful for Aron, but also for everyone who has been touched by his generosity and

who would lose his generous presence. And the loss would be even greater because although he

is not an old man, ████████████████████████████████████████████████████

████████████████████

We ask the Court to impose a sentence that accounts for who Aron Fried truly is—a

fundamentally decent and generous person who is trying every day to put his life back together.

Respectfully,

BRIAN D. LINDER
ISABELLE A. KIRSHNER
ELIEL A. TALO

cc: Kimberly Ravener
    Dina McLeod