**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**19-cr-802 (GBD)**

_____

**UNITED STATES OF AMERICA**

**-against-**

**MENDEL ZILBERBERG,**

**Defendant**.

_____

**SENTENCING MEMORANDUM ON**
**BEHALF OF MENDEL ZILBERBERG**

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Mendel Zilberberg*
**256 Fifth Avenue, 2nd Floor**
**New York, NY 10001**
**Tel: (212) 750-7800**

**BENJAMIN BRAFMAN**
**JACOB KAPLAN**

## Table of Contents

I.      Preliminary Statement.................................................................................................1

II.     Individualized Assessment of Mendel Zilberberg ..................................................3

     A.      The History and Characteristics of Mendel Zilberberg .........................................3

          1.      Mendel's Debilitating and Excruciatingly Painful Back Issues ................3

          2.      Mendel's Background and Childhood ........................................................7

          3.      Mendel is a Dedicated Husband and Father ............................................11

          4.      Mendel Helps All Those in Need..............................................................18

               i.      Troubled Youths ...........................................................................18

               ii.     Community Outcasts......................................................................21

               iii.    Patients Needing Organ Transplants and Medical Treatment .......24

               iv.     Miscellaneous Good Deeds............................................................28

           5.      Mendel's Good Deeds as an Attorney.......................................................33

     B.      The Nature and Circumstances of the Offense Conduct.......................................38

          1.      The Offense Conduct ................................................................................38

III.    Analysis...................................................................................................................41

     A.      A Probationary Sentence with a Period of Home Confinement is a Significant
          Sentence That Would Adequately Punish Mendel.................................................41

          1.      Guidelines Analysis .................................................................................41

          2.      Objections to Probation's Guidelines Analysis .......................................41

               i.      Position of Public or Private Trust/Use of a Special Skill............42

                    a.      Position of Public or Private Trust....................................42

|  |  | b. | Use of a Special Skill | 44 |
|  | ii. | | Leadership Role | 45 |
|  | iii. | | Mendel Is Entitled to the Guideline's Zero Point Offender Adjustment Under U.S.S.G. § 4C1.1 | 48 |
| B. | | | The Sentencing Factors Set Forth in 18 U.S.C. § 3553 as Applied in this Case Support a Probationary Sentence with a Period of Home Confinement | 51 |
| 1. | | | A Probationary Sentence with a Period of Home Confinement is a Significant Punishment in this Case | 51 |
| 2. | | | Mendel's Character and Background Support a Probationary Sentence with a Period of Home Confinement | 54 |
| 3. | | | Neither Specific nor General Deterrence Will Be Served by Incarceration | 57 |
|  | i. | | A Prison Sentence is Not Required to Further the Goals of Specific Deterrence or the Need to Protect the Community | 57 |
|  | ii. | | A Prison Sentence is Not Necessary to Further General Deterrence | 58 |
| IV. | | | Conclusion | 58 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

19-cr-802 (GBD)

_____

UNITED STATES OF AMERICA

-against-

MENDEL ZILBERBERG,

Defendant.

_____

SENTENCING MEMORANDUM ON
BEHALF OF MENDEL ZILBERBERG

Defendant Mendel Zilberberg, through counsel, respectfully submits this Sentencing

Memorandum to assist this Court in determining an appropriate sentence following Mendel's

conviction, after trial, of Conspiracy to Commit Bank Fraud (18 U.S.C. §§ 1349, 3293), Bank

Fraud (18 U.S.C. §§ 1344, 3293), Conspiracy to Make False Statements to a Bank (18 U.S.C. §§

371, 3293), Making False Statements to a Bank (18 U.S.C. §§ 1014, 3293) and Embezzlement and

Misappropriation of Bank Funds (18 U.S.C. §§ 656, 3293). As argued below, counsel respectfully

requests that this Court sentence Mendel to probation with a period of home confinement ███

████████████████████████████████████████████████████████████.

## I.    PRELIMINARY STATEMENT

By most measures, Mendel Zilberberg has dedicated his life for the sake and betterment of

others. Through his countless good deeds over several decades, Mendel has had a tremendously

positive impact on the community and those around him. As will be discussed in detail below,

Mendel's conduct in this case more than **14 years ago** stands in stark contrast to the myriads of

good deeds that he has selflessly engaged in throughout his life. Though serious and deserving

punishment, Mendel's conduct does not equate with the prison term contemplated by the United

States Sentencing Guidelines or requested by the government. Rather, we submit that a probationary sentence with a period of home confinement would be a significant and serious punishment in this case ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

A probationary sentence with a period of home confinement would also be a significant and serious sentence in this case for the following reasons:

- Mendel has already been punished by losing his law license and his profession;

- Mendel and his family have already suffered immense stress and anxiety throughout the painful and uncertain period since the start of this investigation in 2013 and after his arrest in November 2019; and

- Mendel is also at a low risk for recidivism given that he is a 65-year-old first-time offender who has not committed any other crimes. *See United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017) (discussing how recidivism substantially decreases with age). Moreover, Mendel is no longer an attorney or a bank board member and has not violated the law since his conduct in this case, which ended in 2009—more than 14 years ago.

Considering these severe consequences that Mendel has endured and will continue to endure, a sentence of probation with a period of home confinement would reflect the seriousness

of the offense, promote respect for the law, provide just punishment and achieve both general and specific deterrence.

Counsel further submits that a probationary sentence with a period of home confinement is "sufficient, but not greater than necessary" to accomplish the goals of sentencing after considering Mendel's character as detailed in the more than 55 letters accompanying this Sentencing Memorandum from his friends and family who plead with this Court to impose a lenient sentence. From adopting a newborn child with his wife while she was pregnant, to traveling across the world to help a friend's wife obtain experimental medical treatment, to helping troubled youths and those ostracized by their communities, the letters accompanying this Memorandum are replete with personal vignettes demonstrating that Mendel is more than his criminal conduct. Indeed, from these extraordinary letters, the Court will see Mendel as a kind, caring and generous person who has used his time and effort to help others in need throughout his life. For these and the other reasons stated below, we respectfully request that this Court sentence Mendel to probation with a period of home confinement.

## II.      INDIVIDUALIZED ASSESSMENT OF MENDEL ZILBERBERG

### A.      The History and Characteristics of Mendel Zilberberg

#### 1.      Mendel's Debilitating and Excruciatingly Painful Back Issues











### 2.    Mendel's Background and Childhood

Mendel Zilberberg was born in 1958 in Pittsburgh, Pennsylvania, the youngest of 5 children (and only son) to Akiva and Yolanda Zilberberg. As a Holocaust survivor from the Auschwitz Concentration Camp, Mendel's mother suffered from severe psychiatric issues that Mendel's father was ill equipped to handle. (Ex. 4: David Lichtenstein Letter at 1 ("His mother lost her parents and all her siblings in the war and suffered major trauma from her nine months in Auschwitz. Even after arriving in the United States, Mendy's mother was unable to adapt and could not function, leading to difficulties raising her children. Mendy's father left Europe before the war but had his own difficulties transitioning to American life."); Ex. 5: Morton N. Silberberg

----

[1] In

Letter at 1 ("Mendy was raised in a difficult home setting with a mother who had been ravaged by the Holocaust and bore her mental and physical scars her entire life."); Ex. 6: Hinda Spira Letter at 2 ("His mother was a Holocaust survivor (from the camps), physically and emotionally compromised.").)

Mendel shares how his mother's mental condition—which often required shock therapy treatment (PSR ¶ 65)—led to his chaotic childhood:

> My childhood was challenging and difficult. My mother's past trauma exhibited itself in a tortured person who was at times totally withdrawn and depressed, and at times highly excited and constantly screaming irrespective of the cause. There were times where my mother's behavior reached a point where she was hospitalized for electroshock convulsive therapy. In the aftermath of these episodes, she was extremely withdrawn. There were times when the anger became physical. Neither I nor my father ever hit back. I recall a time in which I had to defend one of my sisters as she grabbed my sister by the hair and pulled her down the hallway. By any standards, things were totally out of control.

(Ex. 2: Mendel Zilberberg Letter at 2.)

Although Mendel's mother would often beat Mendel and his siblings, Mendel did not believe that his mother had "a bad bone in her body." (PSR ¶ 65.) Rather, Mendel would come to understand that his mother's physical reactions were "related to a total loss of control due to her mental state." (PSR ¶ 65.)

Complicating Mendel's childhood was the fact that his father had an "old school" parenting style (*id.*) that included fear, intimidation, belittling and physical beatings. Because of his occupations as a businessman and an arbitrator, Mendel's father was often absent from the home for long periods of time. When Mendel's father was home, however, there would be ongoing fighting and screaming between Mendel's parents. (*Id.*; *see also* Ex. 7: Joshua Zilberberg Letter at 1 (Mendel's paternal half-brother: "Mendy and the other children were raised by my father and his

second wife in a very complicated and traumatizing domestic situation that left lifetime scars.").)

Mendel's father ultimately left the home when Mendel was 16 years old.

Bruria Kleinman has known Mendel since he was a young boy. She notes how Mendel

"endured significant developmental trauma and suffered greatly through a difficult, frightening,

lonely and troubled childhood." (Ex. 8: Bruria Kleinman Letter at 1.) Bruria notes how, to escape

his hellish home, Mendel would often seek refuge with Bruria's family:

> Mendel lived in our neighborhood in Brooklyn and as a young boy was attracted to
> the warmth and stability of my vibrant and welcoming family. Mendel did not have
> an easy childhood by any means. He was a frightened, lost soul who pined for his
> dad, who had abandoned the family when Mendel was a young boy. Mendel's home
> was fraught with dysfunction and chaos, and he spent many hours away from the
> mayhem, frequenting our home for hours on end seeking safety and stability. I
> recall Mendel always desperately yearning to be like all the "other" kids who had
> fathers and intact homes. He was a welcome guest, adored by us all, and was always
> respectful, pleasant, obliging and very kind and caring despite his very hard life.
> He remained a close and loyal friend to us all through the years.

(*Id.*)

Bruria also notes how, years later, Mendel repaid her family's kindness with his own care

and compassion when her parents' home was devastated by a fire:

> I will never forget the dismal Friday night in June of 1982, when a devastating fire
> ravaged our family home, leaving our parents and all us children homeless,
> despairing and bereft of every belonging we ever had. Instantly, our beloved friend
> Mendel stepped up to the plate in the most magnanimous way and took complete
> charge of our sudden disaster. I will never forget the goodness, selflessness, love
> and caring he exuded, and the endless, vast hours Mendel extended towards our
> broken and frightened family during that most difficult, terrifying and disorienting
> time. As we struggled to pick up the pieces of our shattered lives, in addition to
> tending to our injured family members, Mendel was our rock, working tirelessly to
> get us a place to live, bringing us beds and bedding, tables and chairs, kitchen wares,
> and much more, while simultaneously assuming the enormous task of assessing our
> losses, gathering endless invoices, speaking with insurance adjusters and assisting
> us in any and every way that would lessen our burden and expedite our quickest
> return home. Mendel never requested or expected anything in return for his
> benevolence, he just gave and gave.

Mendel was our savior and godsend at the lowest point in our lives and I don't know how we would have survived that time without him.

(*Id.* at 1–2.)

Despite his traumatic childhood, Mendel still sees the best in his parents. As he notes in

his letter:

I think my mother was an inherently kind person who was broken by the Holocaust and its aftermath, and my father was a good person who in certain ways never transitioned from prewar Europe, and in other ways was dealt a very difficult hand relating to his life. . . . I think both of my parents were victims of circumstance.

(Ex. 2: Mendel Zilberberg Letter at 2.)

To his credit, Mendel did not let his childhood suffering affect how he treated his mother.

In fact, as Sylvia Zilberberg notes, Mendel was the sole child caring for his elderly mother:

At some point, all her other children dropped out of the picture one way or another and all of his mother's care fell on Mendy's shoulders, and of course I helped him: All medical emergencies, all emergency room visits and hospitalizations, all doctors' appointments and follow up, medication refills, arrangements for the aides, nursing home/rehab placements for periods of time following hospitalizations, and so on; Providing all her food, staples, fresh foods and nourishing cooked meals, and regularly stocking her freezer with individually wrapped meals for easy reheating in between fresh food deliveries; Taking care of the house itself, the plumbing leaks and malfunctions, the electrical problems, the leaking roof, the broken heat, the repeated bed bug infestations brought in by some of the rotating aides; all this in addition to dealing with her squabbling with the aides and trying to fire them, and her alienating relatives with whom she got upset, and so on. Mendy gave and gave and did and did because he felt it was the right thing to do, without stinting in any way, despite the family dynamic . . . .

(Ex. 3: Sylvia Zilberberg Letter at 5.)

Similarly, Hilda Spira (Mendel's first cousin) notes how Mendel continued to care for his

mother as she got older:

At the same time for other Jewish holidays he hosted his widowed mother catering to her specific needs, and making her feel comfortable in their home. As his mother got older her health deteriorated. Mendy took responsibility. She had an aide, and he and his wife were in touch with her constantly. They arranged for them nourishing freshly cooked meals, stocked the groceries, and filled the freezer for

back up. They were also in touch with the neighbor, having her check in just to make sure things were under control. . . . He and his wife were sensitive to recognize how hard the aide worked, and always made her feel good, and understood. He was also on top of the upkeep of the house, seeing to getting things fixed so it should be fit for his mother. He and his wife were in constant contact with her doctors making sure his mother had proper medical care.

(Ex. 6: Hinda Spira Letter at 1–2; *see also* Ex. 9: Gitty Soloff Letter at 2 ("Mendel took care of his elderly, ill, and emotionally unstable/difficult mother, arranging for her medical care and home health aides, getting the roof, plumbing and electric fixed regularly, providing healthy, nourishing meals in her refrigerator and freezer, and hosting her for the various Jewish holidays despite the almost overwhelming difficulties presented with her emotionally fragile state and poor health. Mendel would also talk her down and restore the peace when she became irrationally upset with other children and grandchildren."); Ex. 10: Elizabeth Muschel Letter at 2 ("Mendel was a devoted son to his late mother, showing respect and reverence to her throughout her life.").)[2]

### 3. Mendel is a Dedicated Husband and Father

Mendel met his future wife, Sylvia, in 1991 through a mutual friend. In her letter, Sylvia describes how Mendel was a "genuinely good man" who helped her develop a positive self-image:

I often noted that I met nice men, and I met bright men, but rarely did I meet someone who was really and truly nice and also really bright.

---

[2] Mendel was also dedicated to his in-laws, moving across the street from Sylvia's family as newlyweds so that he could assist his wife's family. (Ex. 3: Sylvia Zilberberg Letter at 1 ("I lived with them for their sake until I married at age forty, and shortly thereafter Mendy and I moved literally next door, connected their house to ours, and served as their main caregiver, medical manager, and everything else. Both my parents, but especially my mother, needed a lot of care and attention, some very specialized, due to each of their conditions."); Ex. 11: Abraham Einhorn Letter at 1 ("Mendy and Zissie moved across the street from my parents, and then finally next door to my parents where Mendy and Zissie remained until both my parents passed on."); Ex. 12: Shifra Erlich Letter at 1 ("Mendel's devotion to his elderly in-laws who resided next door was unsurpassed. As they aged, they needed constant care and Mendel selflessly opened his home and heart to them, caring for them with the highest level of dignity and respect."); Ex. 13: Chana Gobioff Letter at 1 ("I always admired that as a newlywed, he chose an apartment adjacent to his in laws to be a support for them. He helped them maintain a quality life and a sense of purpose until they passed on.").)

Then I met Mendy. What a warm, caring, kind, thoughtful and compassionate person, a genuinely good man, who was always ready to help anyone. While we were out together, I often heard the calls he received from people who needed a favor, some kind of help, some understanding and advice, for themselves, their parents or even third parties. He got the calls because people recognized his innate kindness and desire to help and knew that he would help. And yes, he was very bright, intelligent, knowledgeable, and well informed. And as for me, despite that I was often "the odd man out" because I was atypical of the community I was raised in (I was not a married housewife, I was constantly reading, whether historical, fiction or medical or legal novels, I pursued higher education, and was constantly broadening my horizons), Mendy helped me see my own self in a more positive light, to see good and the worth in myself, the appropriateness of pursuing of my own interests, and the value of my own contributions to others. I finally developed a positive self-image, all because of Mendy.

(Ex. 3: Sylvia Zilberberg Letter at 2–3.)

The couple married in March 1992 and struggled with infertility for more than 8 years—including years of surgeries and painful treatments. In 2000, Mendel and Sylvia started the process of adopting a child from a troubled teenage mother before the child was born. (Ex. 14: Faye Simcha Letter at 1 ("About 25 years ago, Mendy Zilberberg and his dear wife Zeesie made the selfless decision to adopt a 'not-yet born' child whose birth mother was a troubled teen who had become pregnant. They assumed all responsibility for the birth mother's care during the pregnancy and committed to adopt the child regardless of any difficulty, challenges or health issues that child may have.").

During the adoption process, however, Mendel and Sylvia found out that Sylvia was pregnant. Seeing this as a blessing, Mendel and Sylvia continued the process of adopting their son Akiva the day he was born, and then welcomed their biological son, Abraham, five months later. (Ex. 15: Gedalya Jacobovits Letter at 1 ("[A]fter years of not having children, Mendel and his wife made the heartwarming decision to adopt a baby from birth. Remarkably, his wife was in the second trimester of pregnancy at the time. Rather than backing out of their commitment to

-12-

adoption, they wholeheartedly embraced it. They even named the adopted baby after Mendel's father, despite knowing that their biological baby would arrive shortly thereafter. They treated both children as their own with boundless love and care."); *see also* Ex. 14: Faye Simcha Letter  at 1 ("While Zeesie was already in the second trimester of pregnancy at that birth (a circumstance that Mendy and Zeesie were hoping, waiting, and praying for so many years) their commitment to their 'not-yet born' adopted child did not waver at all and they held steadfast to their commitment.").)

Mendel's extremely close relationship with his children has made an impression on those around him. Mendel's stepbrother, Joshua, notes how Mendel is always there for his children:

> Mendy's devotion to his children knows no bounds. Their success and happiness are his primary focus. He selected their schools and even moved to a different county based on what would help their growth and development. He is there for them literally 24/7, as we have seen on our frequent visits and stayovers for advice, direction, comfort, an attentive listening ear, encouragement, whatever they need at that particular moment.

(Ex. 7: Joshua Zilberberg Letter at 4; *see also* Ex. 16: Mordechai Einhorn Letter at 1 ("In all the years I have known him, Mendel has been extremely devoted to his wife, and when they finally had children, to his two sons."); Ex. 17: Rabbi Yakov Horowitz Letter at 1 ("After struggl[ing] with infertility for many years, Mr. Zilberberg and his wife Sylvia adopted a son and had a biological son, both of whom received the boundless love and devotion of their parents."); Ex. 18: Dina Traube Letter at 2 ("Watching Mendel and his interaction with his wife and sons I hope to be able to have that myself. He is always available and supportive even when it is not an easy ask. I have seen him accompany his son when sitting in a car was extremely uncomfortable and quite painful.").)





While raising his children has been challenging, Mendel is determined to always be there for them—noting how, "even in the most challenging moments I have always remained steadfast in my position that I would never leave my children, and that my children would always have a welcome place in our home irrespective of what they did or did not do, could accomplish or could not accomplish." (Ex. 2: Mendel Zilberberg Letter at 3.)

Despite his children's struggles, Mendel has done the best he can to ease Akiva and Abraham into being productive members of society. As Mendel's next-door neighbor, Dr. Michael Muschel, notes:

> [W]e first came to know Mendel's sons as teenagers, they are now in their young twenties. ████████████████████████████ It has made for often challenging ████████████████████ times in the Zilberberg household, and Mendel's unconditional parental love, his unusual thoughtfulness and tenacity in advocating on behalf of his children—often requiring courageous and complex decisions—have been pivotal in keeping them on track and able to look forward to responsible and productive adulthood.

(Ex. 21: Dr. Michael J. Muschel Letter at 2; *see also* Ex. 22: Brynie Stiefel Letter at 2 ("[Mendel's] dedication to them is apparent, their lives revolve around him, and his two sons are very much in need of his guidance and presence."); Ex. 23: Sidney J. Weinstock Letter at 1 ("His passion is to help as many people as he can especially as a very devoted husband and father. His sons depend on him so much and he is always there for his family and friends."); Ex. 24: Yinon Baruch Letter at 2 ("Just as I know how much Mendel's presence and participation in our communal affairs benefitted the community as a whole and various families and individuals in the community, I also see how his day-to-day handling of various family matters in his own home and his guidance and support have a positive impact on his family members."); Ex. 11: Abraham Einhorn Letter at 2 ("I also saw on a daily basis (and continue to see even now) how committed and devoted Mendy is to his wife and two sons, how lovingly, kindly, and insightfully he guides and helps them in every way possible."); Ex. 12: Shifra Erlich Letter at 1 ("His devotion to his children's well-being and education was always obvious and keenly felt. I remember when one of the children's first word was 'Daddy,' it was no surprise. He always puts a lot of thought into what is best for each child's growth and development."); Ex. 25: Rabbi Yosef Yitzchak Jacobson Letter at 3 ("I have seen first-hand, many times, what a dedicated and loving husband and father he is, and even when his

children put him through the proverbial wringer, he responded with extreme sensitivity, thoughtfulness, compassion and kindness, helping them navigate their various significant and, at times, overwhelming challenges. His presence in the home, with his hands on the 'tiller' to guide and assist them, is crucial to their continued well-being and development.").)

For years, Mendel and Sylvia worked together to provide a stable and loving home for their struggling children. As Mendel's sentencing nears, Sylvia is concerned that she will not be able to handle these issues alone and that their children will regress without Mendel's constant support:

> [H]ow do I now face a future alone, bereft, with no support system, and sole responsibility with no support system for our two very dependent young adult children? This is beyond my comprehension. I depend on Mendy for emotional support, for a wise and listening ear, guidance, and his ability to reach our children when I cannot, someone with whom I can share the difficulties, the responsibilities and even the burdens life puts in front of us. Our children are continuously struggling to cope with so much for so many years. How much more can they cope with if the rug is pulled out from under their feet? They rely on Mendy, they lean on him for understanding, guidance, support and direction. Not only would it be a tremendous, insurmountable hardship to me if Mendy were removed from our home, it would significantly impede the stability, growth and development of our children and would most likely cause serious, dangerous regression in both of them, each for separate reasons.

(Ex. 3: Sylvia Zilberberg Letter at 6: *see also id.* at 3 ("These challenges and struggles are ongoing and require the constant supervision, guidance and input of Mendy, who is available to our sons literally twenty-four/seven. I cannot on my own handle or manage their issues or guide them in their struggles going forward.").) This is particularly true given that Sylvia is 72 years old ▮

▮

▮

▮

█████████████████████████████████

███████████████████

### 4.    Mendel Helps All Those in Need

Having suffered through a difficult childhood in a dysfunctional home, Mendel "became a compassionate, empathetic, altruistic person who has an uncanny ability to read the suffering of others and ultimately help in the most humane way." (Ex. 8: Bruria Kleinman at 1; *see also* Ex. 5: Morton N. Silberberg Letter at 1 ("Mendy lived through a very difficult home life and wanted to help others achieve a better life than he had experienced."); Ex. 26: Samuel Karpel Letter at 1 ("I firmly believe that his desire to help others stems out of a genuine sense of compassion and understanding of the challenges faced by the disadvantaged, underprivileged, and those striving to overcome obstacles.").)

As described in the more than 55 letters submitted on his behalf, Mendel goes "above and beyond [] to help those in need and to help improve the lives of those around him." (Ex. 24: Yinon Baruch Letter at 1; *see also* Ex. 27: Rabbi Pinny Andrusier Letter at 1 ("I have personally witnessed Mendel's eagerness to help others, especially those less fortunate and in dire need.").)

### i.    Troubled Youths

Mendel's compassion includes a desire to help troubled youth who felt lost and disassociated from society. Motty Schulman is one example. In his letter, Mr. Schulman notes how he was an "at risk teen" who "fell in with the wrong crowd." (Ex. 28: Motty Schulman Letter at 1.) With "no framework to keep [him] off the streets," Motty's "life was really taking a downward spiral." (*Id.*) Motty's situation deteriorated over the next few years as he was "spending time with toxic friends" and falling into depression.

That all changed when he met Mendel; as Motty explains:

As a favor to a friend, I sometimes drove [Mendel] around when he was here. I got to know him well. I must tell you, there are few people like Mendel Zilberberg. He literally saved my life! He is so wise, sensitive, calm and collected and reassuring! He helped me deal with my many complex feelings, offering me his endless support and keeping me from making mistakes. He made time to meet with me on numerous occasions over a span of time.

Among my many struggles at the time, I was having a hard time with my family. My parents didn't know how to relate to me, and things were rough between us. With so much patience and wisdom, Mendel Zilberberg helped me navigate our complex relationship without burning any bridges. He didn't only have my own interests in mind – he had the breadth of understanding to see everyone's sides, and to guide me toward mature, calm responses that kept the peace and left us all stronger and closer.

(*Id.* at 1.)

Mendel was there again to help Motty when Motty struggled with dating and finding a career:

When my wife was first suggested to me as a potential marriage partner, things did not go completely smoothly at first. Once again Mendel Zilberberg was my savior. With his incredible wisdom and sensitivity he guided me through the tricky process, saying all the right words that led me to the wonderful place I am in now –happily married, with two precious children. He also discussed with me at great length how to go about getting job training and experience in a field of endeavor that interested me, so that I would be able to support myself and provide for my family. I now have a good job and potential for a great career in real estate.

(*Id.*) Reflecting on Mendel's role in his life, Motty notes that Mendel is "more than a father" and how he "cannot imagine what [his] life would have looked like now, had [he] not met Mendel Zilberberg just in time." (*Id.*)

Another youth that Mendel helped was his niece, Estee. As a 12-year-old, Estee "was faced with difficulties within her own home and had to leave." (Ex. 9: Gitty Soloff Letter at 1.) For six years, Estee lived with her relative Gitty Soloff (Mendel's cousin) and family. Taking care of Estee was not easy for Gitty because Estee was traumatized from dealing with her divorced parents. (*Id.*) Gitty also had difficulties dealing with Estee's parents, "who could never agree on anything

regarding visitation, schooling and all else that occurs in daily living." (*Id.*) In her letter, Gitty explains how Mendel and Sylvia were helpful during these difficult times:

> During those 6 years, Mendel, and when he got married, he and his wife, were very supportive. They constantly were there for Estee and us giving moral and financial support. Functionally, there were costs associated with hosting and raising Estee and Mendel participated in covering those costs. Mendel and his wife invited us to their home for weekends, which was a nice, enjoyable break for us. They wined and dined us and let us know how much they appreciated what we were doing for their niece.

(*Id.*)

> Mendel continued supporting Estee as she got older and started her own home:

> As soon as Estee got engaged, Mendel called us offering so much support and assistance with the wedding and setting up the young couple's home, as well as mentoring them through this transition. Estee and the groom were both young and dependent but each for reasons relating to their own particular family issues needed a home of their own with a caring, committed partner. Mendel and his wife gave Estee the emotional support she needed, as well as offering to take Estee shopping for household and personal items to get her set up in her own home. Mendel and his wife kept their promises to us and to Estee in every instance.

(*Id.*)

> Gitty further notes that Mendel was also helpful in caring for Estee's brother:

> Although Estee's brother was placed elsewhere, not with us, and therefore I don't know all the details, I do know that Mendel was very involved in his care as well, and in covering the cost of his care, as well as in mentoring and helping him and the young lady he married, who again, each for reasons relating to their own particular family issues, needed a home of their own with a caring, committed partner.

(*Id.* at 1.) Gitty also credits Mendel with keeping the family together: "Mendel also kept brother and sister connected as family, and often intervened to keep the peace between Estee and her brother and their mother. . . . Estee and her brother each remain happily married to the very same person they married back then, and each have several happy and well adjusted children." (*Id.* at 1–2.)

Seeing the various issues facing disenfranchised young adults, Mendel created an organization with Fruma Schiffenbauer called Binyan Adey Ad that focused on "integrat[ing] these young adults into their respective communities." (Ex. 29: Fruma Schiffenbauer Letter at 1.) This organization provided therapy sessions to help these individuals "deal with their issues," and promote self-esteem, as well as to teach them appropriate social skills. (*Id*.) The organization also helped the youths create a strong support system by providing venues for them to meet. (*Id.*) Mendel also invited many youths to his home on a regular basis "to give them a feeling of belonging and to surround them with love." (*Id.*) Mendel's hands-on involvement "opened up an avenue up for Mendel to become a personal mentor to them and make their problems his own." (*Id.*) Fruma also notes how Mendel "became a role model for all of us because he gave so much of himself in such a selfless way so that no one would feel broken or forgotten." (*Id.*)

### ii.    Community Outcasts

Another group that Mendel focuses his efforts on helping are those who feel ostracized from the community. One example is Nissim Black, an international entertainer and motivational speaker, who was "born into a life of crime," and who now uses his "past experiences to help shape a better future for others." (Ex. 30: Nissim Black Letter at 1.) In his letter, Nissim explains how Mendel "swooped in" to help when Nissim, an African American Orthodox Jew, faced discrimination and racism from within the community:

> As an African-American Orthodox Jew who grew up in the inner city, I can't begin to explain what it's been like to have a friend such as Mendel enter my life over the past 5 years ago. His kindness has been boundless. My family and I were facing discrimination and blatant racism in our community and Mendel swooped in and was an ear when I needed to be heard and he was a warrior when I needed to fight.

(*Id.*) Nissim further notes that Mendel "champions the causes of the less fortunate" and "sees the good in humanity." (*Id.*) In requesting a lenient sentence, Nissim notes how, in Mendel's absence, "there will be a major lacking of loving kindness" in his life and the lives of many others. (*Id.*)

Another person that Mendel has profoundly impacted is Lipa Schmeltzer. In his letter, Lipa describes how he was ostracized from his Jewish community for "introducing fresh modern ideas" through his music and influence. (Ex. 31: Lipa Schmeltzer Letter at 1.) This "heavy backlash" included his children not being accepted to local schools. (*Id.*) Lipa notes how Mendel "demonstrated exceptional kindness and support during that challenging time in my life when I felt estranged from my own community." (*Id.*) Lipa further notes how Mendel's "unwavering support allowed me to find common ground and peaceful coexistence within my community, despite resistance." (*Id.*) Thanks in part to Mendel's assistance, Lipa is now one of the most famous Jewish entertainers in the world.

Mendel's assistance did not end there. When Lipa was having personal hardships and a financial crisis due to the community backlash, Mendel once again stepped up by arranging for the local schools to give Lipa a tuition break until Lipa could get back on his feet. (*Id.*) Mendel also "stood up" for Lipa and helped Lipa "establish a better reputation" by advocating for him "in the public sphere." (*Id.*) Mendel also supported Lipa when Lipa decided to go back to school; Lipa notes: "The story of how I ended up graduating from Columbia University after knowing little English, growing up in New Square, could be a full documentary. Nevertheless, I could have never have done all of the above without the support of several people including Mendel Zilberberg." (*Id.*) Considering the impact that Mendel has had on his life, Lipa notes how "it is [his] duty to express my profound appreciation for someone who has made a significant impact on my life and to extend a helping hand when they need it most." (*Id.*)

Mendel also had a significant impact on Mendel Taub when Taub was having difficulties starting a new life after leaving his Hasidic community. In his letter, Taub notes how he found himself "adrift" with a daily reality of "[h]omelessness, financial hardship, and cultural disorientation." (Ex. 32: Mendel Taub Letter at 1.) Taub describes how Mendel's "unwavering support" was instrumental in helping Taub navigate this tumultuous time in his life:

> It was during these trying times that I was introduced to Mendel and his family. Invited to a Sabbath dinner at the Zilberbergs by a classmate and family friend, I was not merely welcomed into their home; I was embraced as one of their own. This gesture marked the beginning of a transformative relationship. Mendel's unwavering support went far beyond providing me with meals or a place to stay. He became a mentor, guiding me in my academic endeavors, honing my reading and writing skills, and introducing me to the vast world of law. Through countless hours of guidance and unwavering belief in my potential, he paved the way for my eventual graduation from the police academy and subsequent acceptance into law school.

(*Id.*) Now a captain in the U.S. Airforce JAG Corps, Taub notes that to "say that Mendel played a pivotal role in [his] life would be an understatement." (*Id.*) Taub further notes that he "wasn't an exception," as he "witnessed [Mendel] assisting everyone around him because that's simply the kind of person [Mendel] is." (*Id.*; *see also id.*: ("Mendel has demonstrated, through countless acts of kindness and selflessness, his innate goodness.").)

Another poignant example is Israeli Arab Isaac Malabee, who met Mendel while working as a waiter at a restaurant in Israel. (Ex. 33: Isaac Malabee Letter at 1.) Isaac notes how Mendel "didn't just see 'the waiter'" but "really saw the person behind every encounter." (*Id.*) Isaac notes how "[e]ven though [they] come from such different backgrounds, and normally this would be a topic fraught with tension, [Mendel] didn't view [him] as 'an Israeli Arab,' but saw [him] as Isaac, an equal." (*Id.*) In his letter, Isaac describes Mendel as "extremely unique, open-minded and kindhearted individual" and as an "incredibly special person." (*Id.*) In closing, Isaac notes that he

had "never met a person from such a different background that [he's] connected to like that," and

that he admires Mendel "for the great feeling he always gave me – and gives to others." (*Id.*)

### iii.    Patients Needing Organ Transplants and Medical Treatment

Having dealt with his own physical ailments, Mendel is sensitive to those suffering through

a medical crisis. Rabbi Pinny Andrusier first met Mendel in 2015 during the Jewish High Holidays;

he notes that, despite the synagogue having nearly 750 congregants, "Mendel's huge heart and

compassion made him stand out above all others." (Ex. 27: Rabbi Pinny Andrusier Letter at 1) In

his letter, Rabbi Andrusier recounts the time when Mendel stepped up when he learned that

someone in the community, ███████, was in dire need of a kidney donor but deemed "unworthy"

by transplant organizations due to his critical condition:

> [B]ecause his condition is so critical, no organization was willing to help. They
> consider ███████ dire condition not worthy of receiving a living donor kidney.
>
> Despite ███████ persistent efforts, he was turned down by every medical
> institution and renal organization he met. ███████ still undergoes 5 hours of
> dialysis, six days a week and remains the longest active patient on many kidney
> transplant lists.
>
> Mr. Zilberberg could not bear to hear this and immediately took action. He
> personally drove down from upstate New York to Brooklyn to introduce ███████
> to the heads of Renewal, a not for profit organization dedicated to assisting people
> suffering from various forms of kidney disease and in need of a transplant, and ███
> ███ was finally placed on their list as a top priority.
>
> Together with the help of Renewal, Mr. Zilberberg personally spearheaded a global
> campaign to find a kidney donor. He helped coordinate kidney drives and arranged
> for a short video to be produced, which was then sent to thousands on social media.

(*Id.*)

Mendy Reiner started Renewal, "an organization whose sole objective was to match up

people who needed kidneys, whose lives could be saved only by a kidney transplant, with willing

donors compassionate and generous enough to part with one of their kidneys to save a fellow

stranger's life." (Ex. 34: Mendy Reiner Letter at 1.) In his letter, he notes how Mendel's "advice

-24-

and guidance strengthened [his] resolve, helping [him] to push forward and found Renewal." (*Id.*)

**To date, Renewal has arranged 1000 kidney transplants**—organizing approximately 125 transplants per year. (*Id.*) He credits Mendel with helping Renewal reach this goal: "[Mendel's] foresight, planning, skill, drive, and active participation is a debt that cannot be repaid. Despite everything else, we continue to respect him for his dedication, commitment, and overwhelming desire to help people in need, and his ability to accomplish those goals." (*Id.* at 2.)

Another supporter, Leba Schwebel, writes how Mendel was instrumental in attempting to find a lung for her sick sister suffering from chronic lung disease:

> I am overcome with deep emotions of awe and gratitude to him for stepping up to the plate and making our struggle his and helping us in our search. Perhaps, we prayed, we could find a donor by publicizing our sister's cause. Mendel helped us write press releases, assisted us in setting up a hotline (1- 800-728-3254 Save-A-Life) and reached out to different news outlets on our behalf. He spent countless hours calling different hospitals and organ donor networks as time was of the essence. Mendel Zilberberg appeared in our lives as a guardian angel, with no other benefit other than helping another human being. I can never repay him for his kindness and goodness, and his superhuman efforts on my sister's behalf.

(Ex. 35: Leba Schwebel Letter at 1.) Unfortunately, Leba's sister passed away before receiving a transplant. Leba notes, however, how Mendel's help provided solace for the family: "We were comforted knowing that we were not alone, and all human efforts had been expended upon her behalf. It was only through the help of a few selfless individuals, led in large part by Mendel Zilberberg, that we were provided with solace." (*Id.*)

Mendel has also gone out of his way to help others going through medical issues. Mendel met Adina Duchman-Altein in the early stages of her husband's battle ████████████ ████████████████████████ (Ex. 36: Adina Duchman-Altein Letter at 1.) To accommodate her husband's medical treatment, they uprooted their family from Winnipeg and moved to Monsey, across the street from the Zilberberg family. (*Id.* at 2.) She recalls how "the

beginning of [Mendel's] consistent acts of kindness" began with "a large box of toys appear[ing] at [their] door." (*Id.*) Mendel "didn't just provide emotional support but also offered practical solutions, guiding [Adina] to local organizations that could assist [her] family." (*Id.*) Adina notes how Mendel also helped her children get through this difficult time:

> Mendel's interaction with my children was particularly heartwarming. His genuine interest in them, his ability to make them feel valued and loved, even during these challenging times, created a sense of normalcy in a situation far from it. Whether sharing a story or a lighthearted joke, he wisely understood what we needed to hear. He seamlessly transitioned into a supportive role, as if he had always been there for us.

(*Id.*)

Mendel's compassion and sensitivity to Adina and her family went beyond practical advice and emotional support:

> Perhaps the most remarkable gesture was the establishment of a discreet account at the local supermarket, unrequested but a lifeline. Mendel understood our needs without any words exchanged, ensuring that our weekly essentials were provided without any hesitation or judgement.
>
> Furthermore, it's important to note that everything Mendel did for our family, he continues to do with unwavering dedication. Mendel's compassion remains an integral part of our lives. He reaches out to me on a weekly basis, checking how I'm feeling, and sharing uplifting messages that brightens my days. His ongoing support demonstrates the true essence of his character.

(*Id.* at 2–3.)

Another person that Mendel showed "unwavering dedication" and "ongoing support" to was Marvin Neiman when he was "in dire need of help with [his] late wife's medical issues and had nobody else to turn to for help." (Ex. 37: Marvin Neiman Letter at 1.) Marvin's wife, Hessie, was "seriously ill with Frontotemporal Dementia, which destroys brain function." (*Id.*) In his 5-page letter, Marvin details Mendel's considerable assistance that included researching domestic and international stem-cell treatment options, setting up and attending a meeting with a director of a company running a clinical stem-cell treatment trial and traveling to India four times to help

facilitate the stem-cell treatment. (*Id.* at 2–3.) Mendel also organized the travel accommodations and arranged for special waivers from the Indian government to expedite Hessie's treatment. (*Id.*)

Sadly, this year-long treatment failed to help Hessie. Nevertheless, as Marvin notes, "success or failure of the treatment is not how we measure what Mendel did for us." (*Id.* at 4.) Rather, Marvin notes how Mendel "helped us with all of this out of kindness, compassion, caring and a desire to help a friend in any way he could" because Mendel understood that Marvin "could not just let it be, and [] needed to try any and every possibility however experimental or remote, to help [his] wife." (*Id.*; *see also* Ex. 26: Samuel Karpel Letter at 1 ("I recall Mendel dedicating substantial time, effort, and resources to helping a friend's grievously ill wife receive potentially life-saving medical treatment. It was done privately and discreetly, without any desire for recognition.") In seeking this Court's compassion, Marvin notes that the "time and effort it took to make all this happen is incalculable," and wonders "[h]ow many people do we know who would have done what Mendel did for us?" (Ex. 37: Marvin Neiman Letter at 4.)

Mendel has also helped families deal with infertility and miscarriages. Brany Rosen is the founder and director of A TIME, an organization that helps families confront the challenges of infertility. (Ex. 38: Brany Rosen Letter at 1.) She notes how Mendel "has helped A TIME in so many ways and he has done so much, through our organization, to help individuals and couples in the areas of adoption, fertility and pregnancy loss." (*Id.*) Brany explains how Mendel was the "single-handed architect" of her organization's division dedicated to helping families through the adoption process:

> Mr. Zilberberg was the single-handed architect of THE MENORAH PROJECT, a new division of A TIME dealing with adoption, which he developed and turned over to us complete with name, mission statement, website, artwork and relevant domain names. This allowed us to be the guiding light and link for people looking to find homes for Jewish babies and prospective adoptive parents looking for Jewish adoptions in order to preserve their heritage. This has become an area of

focus for our organization, all built on Mr. Zilberg's vision, advice, experience,
and interest in helping people. In addition to placing healthy babies, we assist in the
adoption of children born with Down's Syndrome and other disabilities or
challenges, as well as placing older children whose family or home can no longer
take care of them.

(*Id.*)

In addition, Mendel uses his own previous experience adopting a child to help guide others

through the adoption process:

Mr. Zilberg had open and honest discussions with anyone interested in adoption
about his and his wife's adoption of their older son and shared with our audiences
at our seminars the beauty and blessing of adoption and how to navigate the rather
technical, lengthy and anxiety laden process. In fact, the most famous and widely
listened to recording of any of our sessions to date is a seminar he ran on adoption,
at which he also brought in social workers to address some of the technical details.

(*Id.*)  Mendel also shares Sylvia's experiences with pregnancy losses to help other families who

have suffered devastating miscarriages: "Mr. Zilberg was also famously there for couples who

have experienced devastating pregnancy loss, with many different resources, again sharing his and

his wife's experiences through their own multiple pregnancy losses." (*Id.*) Notably, "[e]verything

Mr. Zilberg has done, he has always done with his whole heart, with great sensitivity to other

people's situations and the utmost respect for other people's privacy." (*Id.*) Brany further notes

that Mendel "is a shining example of how to help and take care of another person and what another

person's issues should mean to you." (*Id.*)

### iv.   Miscellaneous Good Deeds

Mendel was also helpful to those affected during Hurricane Sandy. Mordechai Atlas is

Mendel's nephew. In 2012, Mordechai lived in the Seagate section of Brooklyn that was devastated

by Hurricane Sandy. In his letter, Mordechai notes how Mendel "jumped into action" to help the

200 Seagate families who had nowhere to sleep:

In October 2012 we lived in the Seagate section of Brooklyn NY, and we were hit
badly with hurricane Sandy. This turned our lives and our communities' lives upside

down. We were a group of 200 families with little kids with nowhere to sleep. Of course my first call was to Mendel and of course Mendel jumped into action, working the phones and finding shelter for families to sleep that same night. I remember one specific family, total strangers to Mendel, that was placed in an apartment in the Flatbush section of Brooklyn which was under construction and had no appliances, and Mendel arranged for appliances to be delivered the same day they moved in.

(Ex. 39: Mordechai Atlas Letter at 2.)

Mordechai also notes how Mendel visited the Seagate several times in the days and

weeks after the storm to help the ravaged community:

After the hurricane passed, Mendel came back to Seagate with us numerous times to help us and many others in our area assess the damage, locate generators and machines to pump water out of deeply flooded basement, reach plumbers, electricians, and phone companies who were totally overwhelmed to restore service, and deal with various salvage, restoration and insurance companies, to begin the long and mind-numbing process of recovering from this disaster. He also assisted in arranging for food trucks, blankets and emergency supplies for the neighborhood people and all the volunteers who were helping out of the kindness of their hearts, day and night.

(*Id.* at 3.)

Willy Beer has known Mendel for more than two decades. In his letter, Willy describes

how Mendel was the "driving force" behind a community project to rebuild Seagate:

I would like to share my interactions with Mr. Zilberberg after Hurricane Sandy hit New York City in 2012. Our offices were headquartered in Brooklyn at that time, and – after seeing the devastation of the storm – my business partner and colleagues wanted to do something more than write checks to the various charitable organizations involved in the recovery efforts. Mendel was instrumental in helping us determine the best course of action, so that we could truly make a difference in the lives of those most in need. Ultimately, we raised more than $1m and engaged contractors, electricians and engineers to replace boilers and electric panels in more than 80 homes in the Seagate neighborhood of Brooklyn which was devastated by the flooding. Mr. Zilberberg was the driving force behind the project, working with insurance companies, identifying contractors and making certain that the families who most needed assistance were helped.

(Ex. 40: Willy Beer Letter at 1–2.) Willy further notes that they "could not have made such a

valuable impact on that community without [Mendel's] guidance." (*Id.* at 2.)

Another area where Mendel has focused his energies is helping those who are looking for employment or need business advice. Michael and Elizabeth Muschel are Mendel's neighbors; they note how Mendel helped their son—who Mendel did not really know—when he lost his job early in his career:

> When my son, an attorney in Florida, lost his job some years ago–he was then a thirty-two old father of two–Mendel provided my wife and I with crucial emotional support. He then immediately made finding our son a new position his passion and his new priority. Mendel called Florida religious and communal leaders, he called numerous local and Florida attorneys, he consulted and strategized with my son, and he left no stone unturned as he gave of his time selflessly and boundlessly. We have over the years watch him similarly extend himself to so many other people confronting a wide range of professional, personal, and financial crises. Mendel's unusual blend of kindness, keen insight and extensive networking skills allows him to offer professional, personal, and financial advice that is unique to the situation and that often proves transformative for the people in need.

(Ex. 21: Dr. Michael J. Muschel Letter at 1–2; *see also* Ex. 10: Elizabeth Muschel Letter at 1 ("[S]everal years ago, our son had been let go by his employer and was in need of a job. Our son, who has his own family to support was understandably despondent. Mendel spent many hours speaking to our son by phone, offering his advice and trying to network on his behalf, utilizing his own personal network to help someone in need. Mendel did not really know our son, yet he gave his time and effort just to help a young man at the beginning of his career.").)

Elizabeth also notes how Mendel helped her husband when he was having issues at his medical office:

> We went over to see Mendel and to talk to him about the situation. Mendel offered his sage advice, and calmly approached the problem, offering different perspectives and ideas about how to arrive at a solution. Even days later, Mendel reached out to us, saying that he was still thinking about Michael's problem and had some new thoughts that might be helpful.

(*Id.* at 2.)

Several others write passionately about how Mendel helped them with business/career advice:

- "Mendel has helped me with my business from inception, with building my brand, negotiating contracts, negotiating terms, working out an operating agreement with my partners, etc., and when the business was having cash flow issues, he was always the one to call for advice. The business had its share of ups and downs, and he helped me work my way through them all. I couldn't have developed and grown my business without him. Today my brand is well known for quality and recognized on sight in the stores." (Ex. 39: Mordechai Atlas Letter at 2);

- "His timely counsel has helped shape our careers. When I (Arun) was at a crossroads about career choices, the advice Mr. Zilberberg gave enabled me in steering from print media to electronic media, which propelled my professional growth." (Ex. 41: Sukanya Dhulipati and Arun Shankar Letter at 1);

- "We are immensely grateful for his guidance, and we consider ourselves indebted to his expertise. His ability to foresee market trends and provide strategic advice has made a lasting and positive impact on our family's financial wellbeing." (Ex. 42: Bharat Golecha Letter at 2); and

- "The wisdom and guidance I received from Mendel during our time together proved invaluable. I carried his advice and support with me as I established my real estate business in the United Kingdom, primarily focused on letting small office spaces. To this day, I continue to reap the benefits of Mendel's assistance and am grateful for the significant role he played in my success." (Ex. 43: Robert Grussgott Letter at 2.)

In addition to helping individuals in need, Mendel also dedicates his time and efforts to assist organizations in bettering the community. (*See*, *e.g.*, Ex. 44: Rabbi Sholom Landau Letter at 1 (describing Mendel's efforts on behalf of the students at Yeshiva Ohr Shraga Veretzky and the local community: "The Yeshiva and hundreds of young boys have personally experienced and benefited from Mendel's unrelenting push to ensure that all the boys in the School received all tools available; remedial, tutorial, financial aid or otherwise, so that 'no child was left behind,' on any level. Within the community, I personally witnessed and was privy to Mendel Zilberberg's involvement as an integral part of the community, working within its schools, synagogues and

-31-

organizations for several decades, having positively impacted in so many wonderful ways hundreds, if not thousands of people, individuals and families through the years."); Ex. 45: Barry Spitzer Letter at 1 (describing Mendel's contributions as a Board Member of Community Board 12: "Mr. Zilberberg was focused on creating balance and maintaining harmony, promoting understanding and respect among the participants, giving them each a voice, and also listening to, respecting, and understanding community members at large who are inevitably affected by the outcome of Board decisions. . . . Mr. Zilberberg was a true community advocate while on the board and volunteered many hours of his time to serve his neighbors."); Ex. 46: Shlomo Weinberger Letter at 1 (detailing Mendel's assistance to Vaad Refuah, a patient advocacy and education organization: "When we started Vaad Refuah, we faced many issues. We had to convince the hospitals that we were trying to help patients and that we were not a challenge to them. Mendel played an integral role in establishing our strategy. He provided the organizational skills needed, as well as some of the seed money. Our meetings were held in Mendel's offices. It is to his credit that so many patients were helped and many more will be helped in the future."); Ex. 47: Rabbi David Zwiebel Letter at 1, 2 (noting Mendel's involvement with the Agudath Israel of America for nearly three decades: "[Mendel] played a significant role in the governance of the organization and the broad array of charitable and educational projects sponsored by the organization" and "carried out his Agudath Israel responsibilities with care and compassion, with intelligence and integrity, with discipline and dedication.").[3]

---

[3] For additional examples of Mendel's good deeds, see the following letters: Ex. 48: Rabbi Isaac Heschel Letter at 1–2 (detailing Mendel's extraordinary efforts to facilitate Rabbi Heschel's mother's expedited burial in Israel and noting how "in the Jewish religion the ultimate act of kindness is to help the deceased and Mendy clearly accomplished that."); Ex. 49: Ben Rozsansky Letter at 1 (expressing how Mendel helped Ben and his children through Ben's divorce, noting: "The time spent with Mendy helped me heal through my divorce and with his support, helped me stay strong. . . . I cannot adequately express how much I and my children needed this support

### 5.      Mendel's Good Deeds as an Attorney

Because Mendel's role as an attorney was discussed at trial, we believe that it is important for the Court to also hear about the positive impact that Mendel has had as an attorney. Rabbi Simcha Roth has known Mendel for the last 35 years. He notes how Mendel "has a reputation not only as a very accomplished attorney, but as one who always puts his heart into his client's plight and the pursuit of justice." (Ex. 50: Rabbi Simcha Roth Letter at 2.) Rabbi Roth shares one example where Mendel represented, pro bono, a struggling father of twelve children who was defrauded—even flying to Israel on his own expense to conduct depositions:

> I particularly recall an incident when I met Mendy at a massive community gathering [] and shared with him the disturbing plight of a client from Israel []. This client was a hardworking man who struggled to provide for his family of twelve children and was financially destroyed by a con artist who robbed him of all his savings by inducing him into a fraudulent investment. There was very little I could do for him in the Beth Din system as discovery is very limited and he had no money for the expensive legal process in the United States.
>
> Mendy was taken aback by this and immediately offered his help. He actually traveled to Israel at his own expense, conducted depositions and filed court actions, doing all he could to bring justice in this matter.

(*Id.*; *see also* Ex. 51: Stewart Ostrov Letter at 1 ("One memorable occasion was when he invested his own money and time to successfully retrieve the savings of an orphan who had been taken advantage of by a scam artist.").

---

system, the child rearing guidance, and the opportunity to share their family life."); Ex. 52: Rajesh Subramanian Letter at 1 ("Mendel came into my life at a time when my father (a former diplomat) had suffered a crippling stroke. [Mendel] came to the hospital and stayed by the side of my mother and me. My relationship with him was built in this moment."); Ex. 53: Menachem Gottesman Letter at 1 ("His devotion to the family in general and my elderly mother in particular, stands out. My mother passed away this year at the age of 100 years old. Mendel had tremendous love and respect for his elderly aunt and always made time to visit with her, relating to her with utmost respect and dignity. In her later years, she resided in Israel which Mendel visited frequently often for a short 24 hours. Despite his back to back schedule of appointments, Mendel always made sure to visit my mother and brighten her day. She looked forward to those visits, knowing how much he sacrificed to make them.").

Rabbi Roth also notes how Mendel assisted him when the rabbi was the executive director of a large community organization:

> Mendy, as a qualified lawyer but with no affiliation with the organization, was one of our go-to people. He always gave his full attention graciously without ever asking for remuneration or even hinting about it. What was even more amazing to me was that in that professional capacity I unfortunately dealt with many problematic families who required legal guidance and Mendy was always available to help those total strangers pro bono, fully engaged with his brain, heart and soul.

(Ex. 50: Rabbi Simcha Roth Letter at 1.)

Mendel also assisted another pro bono client, Mrs. Tila-Cohen, when she was fired from her job for not working on the Sabbath. Rabbi Pinny Andrusier relays how Mendel got involved to help someone he just met:

> On another visit to South Florida, Mr. Zilberberg noticed a young woman in our community was clearly distraught. On his own initiative he approached Mrs. Tila-Cohen and asked what was wrong.

> She informed him that the company she worked for, Pembroke Pines Lexus, had informed her that day that she must begin working on the Jewish Sabbath or she would be fired.

> Mrs. Tila-Cohen had only recently moved to the United States from Israel with their four young children. Her husband was an Egged bus driver in Jerusalem and narrowly escaped a bus bombing. Unable to deal with the ensuing trauma, they hoped to make a new start here in America.

> They each immediately took full time jobs and were working hard to make ends meet. Expenses were high and it wasn't easy. They were seriously struggling financially and then the other shoe dropped when she was told that she must violate the Sabbath or be fired. This was something that was always non-negotiable for her, but how was she going to be able to help provide for her children. Her husband was not making nearly enough.

> Mr. Zilberberg immediately calmed her down and promised that he would help. When she responded, that she could not afford an attorney, Mr. Zilberberg assured her that it would be an honor to help her free of charge because no person should be forced to violate their faith, especially here in the United States.

-34-

Mr. Zilberberg did in fact correspond with Lexus and successfully had them rescind their threat. She remained employed there and was able to continue observing her Jewish faith.

(Ex. 27: Rabbi Pinny Andrusier Letter at 2.)

Rabbi Andrusier also notes that Mendel never sought payment or recognition for his work; instead, he helped her out of the "goodness of his heart":

Despite his efforts and success, Mendel never once sought recognition, compensation or accolades. It came from the goodness of his heart, as he once again demonstrated sincere and genuine concern and compassion for someone in desperate need for guidance and help.

(*Id.*)

Eva Kamenetsky first met Mendel 10 years ago through various charitable organizations; she notes how she "greatly benefited from his pro bono work when [her] daughter was engaged in a contentious divorce and custody battle":

Mendel got wind of the difficulties we were having, and he invited us to meet with him to discuss ways to legally tackle some of the accusations my daughter was facing in court. He spent a few hours with us during his regular workday and advised us how to refute some of the falsehoods being lobbed at her. . . . He advised that my daughter fight the allegations in family court and rebuild her life after her certain victory in the custody battle.

(Ex. 54: Eva Kamenetsky Letter at 1.) Eva notes how her daughter "won the custody battle and rebuilt her life" after she followed Mendel's advice and has since "completed her education and built a career as a physician's assistant." (*Id.*) Notably, Mendel refused to accept payment for his services, telling Eva that her "bill was paid in full, since [they] were kindred spirits, both trying to help [their] families and [their] communities." (*Id.*)

Mendel also assisted Hatzalah, a Jewish volunteer emergency medical service organization, in its efforts to obtain a waiver to provide advance life support services in New Jersey. Hatzalah Administrator Motty Twerski explains:

-35-

Initially, no EMS agency or first aid squad in the State of New Jersey was able to provide Advanced Life Support (ALS), otherwise known as Paramedics, to its patients. ALS in the State was and is provided by regional State allocated providers who have the exclusive in their respective regions. Although response times for these providers was within State standards, Hatzolah wanted to bring a better response time to its service area by allowing Hatzolah volunteers to provide ALS.

Many government, hospital, educational, and private agencies had to work together to cut through the red tape and adversity to create an entity and obtain a waiver (under the umbrella of State providers) for Hatzolah to be allowed to provide ALS service. Mendel Zilberg was a tireless force in pursuing this goal, providing invaluable guidance and knowledge in successfully navigating this process. The results were the achieved objective. Hatzolah of Lakewood (now known as Hatzolah of Central Jersey as its reach has expanded) started providing ALS in its service area in 2008. Hatzolah now has 30 volunteer paramedics providing ALS 24/7. We operate 7 State certified ALS vehicles. Countless lives have been saved. We were the first and are still today the only EMS agency in the whole State that has this arrangement. This was never replicated by any other agency. The advice, strategic planning, direction, and drive of Mendel Zilberg were invaluable in making this happen.

(Ex. 55: Motty Twerski Letter at 1.)

These examples are not uncommon, as several other friends and supporters write this Court

detailing how Mendel has aided the community through his legal expertise:

- "Mr. Zilberg also donated his time to many not-for-profit boards, providing legal services and oversight at no cost to the organizations. We served together on the board of a large assisted living facility in the Bronx that provides services to an elderly and indigent population. Mr. Zilberg assisted the facility with compliance and regulatory issues, oversaw major capital improvement initiatives and provided oversight and input in charitable giving programs." (Ex. 40: Willy Beer Letter at 2);

- "Mendy's actions extend far beyond the courtroom, reflecting his genuine concern for the welfare of others. Whether it's volunteer work for the local synagogue, helping it negotiate contracts with various vendors and with it's day-to-day challenges or charitable activities, such as providing expensive emergency medical equipment and supplies to local emergency volunteer organizations, etc., he has demonstrated an extraordinary willingness to invest time, effort, and resources into creating positive change. (Ex. 56: Moishe Geller Letter at 2);

- "Mr. Zilberg is blessed with an organized mind and problem-solving skills. He has helped people reconcile financial disputes out of court by

coming up with creative solutions to ensure that all parties are satisfied. In the cases I am aware of, both parties involved felt like they got the best deal both in terms of financial gain and especially by minimizing strife between them. Similarly, I have seen complex family situations where Mr. Zilberberg helped individuals divide their assets fairly among their children. It is remarkable how he always figures out a way to keep everybody happy and maintain harmony in the family." (Ex. 57: Rabbi Zalmen Leib Meisels Letter at 1);

- "It is rare that I come across an individual with the level of talent, skill, and professionalism of Mendel Zilberberg, who selflessly puts his considerable skills at the disposal of the school doing whatever he can to be of assistance, often without having to be asked. Anything from mediating differences of opinion among the leadership, or negotiating with the faculty, Mendel Zilberberg is always ready to do what it takes to assist the school in any way possible. Of particular note, in cases of disputes between the school board and the teachers about fundamental issues and relative rights, including salary and security, Mendel Zilberberg was the one and only person both parties agreed upon as a mediator, and both sides were pleased with the results. Again, in the case of binding arbitration regarding a severance issue, both the school and the teacher selected Mendel Zilberberg as arbitrator and again both sides were pleased with the results. Mendel Zilberberg provided our school with assistance in a variety of other matters, including insurance, legal matters, structural issues, logistics relating to transportation of hundreds of children on a daily basis, immigration, and general administrative matters. Mr. Zilberberg also arranged food distributions to the impoverished among our constituent family during holiday seasons, and support for members struggling with challenges." (Ex. 58: Rabbi Chaim Garfinkel Letter at 1);

- "While I've known Mendel since the 1980s, I forged an especially strong bond with him in the early aught years through Mendel's involvement with community issues relating to Maimonides. Mendel had been approached by the community for help in improving conditions at Maimonides [Hospital]. He reached out to me and attended many meetings with the Trustees and CEO seeking collaborative ways to address the communities' issues. Notwithstanding the complexities of a multi-ethnic patient base and a diverse and divergent set of board members, Mendel was able to maintain a laser-like focus on his personal mandate; bettering the lives of the less fortunate. It was that unwavering commitment that enabled Mendel to achieve his landmark accomplishments, including shortening patient admission times, and reinforcing family visitation rights, all the while balancing the hospital staff's need for order and decorum." (Ex. 59: Moishe Hellman Letter at 1);

- "Another example of Mendel's compassion and support was when one of my staff members faced legal issues. Mendel voluntarily offered his assistance in any way he could and proved to be an invaluable help to this individual and their family." (Ex. 15: Gedalya Jacobovits Letter at 1); and

- "In 2015 my father Mendel Weinstock, owner of a large corporation Meal Mart Inc. passed away. I am one of 4 siblings and there was a lot of confusion and discrepancy as to the distribution of Mendel Weinstock's wealth. Because I was not working in the business, I could have lost my shares. Mendel Zilberberg helped me through this very difficult and painful time spending countless hours meeting and phone calls making sure there would be a peaceful resolution so the family would not be torn apart. His brilliance and compassion for this cause was exemplary. He did not charge me any money and wanted only to be helpful to me." (Ex. 23: Sidney J. Weinstock Letter at 1.)

**B.     The Nature and Circumstances of the Offense Conduct**

**1.     The Offense Conduct**

The conduct at issue was addressed in a week-long trial and summarized by the Probation Department in the PSR. (PSR ¶¶ 12–35.) Although we respect the jury's verdict, it was not an affirmation of every government allegation or a wholesale acceptance of every witness's testimony. As this Court presided over the trial, it is in the best position to determine the scope of Mendel's conduct within the parameters of the jury's verdict.

We write briefly, however, to address one aspect of the case as it potentially relates to sentencing. Throughout the case, the government has argued that Mendel never paid back the loan proceeds that he received as part of the scheme. (*See, e.g.*, Tr. 10, 813, 817). We note, however, that the evidence in the case demonstrated that Mendel's arrangement at the time of the loan was that Mendel would work off the money he received from Aron Fried as legal fees. We do not raise this issue to challenge the jury's verdict, minimize Mendel's conduct or to dispute the restitution and forfeiture amounts. Rather, we note this to preemptively address the question in the Court's mind as to why Mendel never paid back the proceeds of the loan.

In fact, trial witness Gilah Jacobowitz testified at the FDIC in 2013 to this exact point:

Q:      Did you ever enter into any business relationships with Mr.
        Zilberberg other than engaging his services as an attorney?

GJ:     We lent him money to a company by the name of One World United.
        It was a medical billing company, to my understanding. And we
        gave him a loan towards the business which we knew we would
        work off for legal fees.

(Tr. 570–71 (quoting FDIC testimony).)

Jacobowitz further testified as follows at the FDIC:

Q:      Did One World United pay you back?

GJ:     No.

Q:      What happened to that money you loaned?

GJ:     We exhausted it with legal fees.

(Tr. 571 (quoting FDIC testimony).)

Jacobowitz testified to this point again at the FDIC:

Q:      So even though you were at a point where you were trying to raise
        money to support your new business, you were nonetheless willing
        to lend money to Mr. Zilberberg?

GJ:     We realized that we'd be going through a lot of legal expenses, and
        we were spending a lot of time with Mr. Zilberberg on litigation. So
        we knew that was going to be exhausted pretty quickly.

Q:      So, in your view, it was sort of like a fund to support the litigation?

GJ:     Yes. We knew that we were going to work it off, basically.

(Tr. 576 (quoting FDIC testimony).)

This FDIC testimony was consistent with the trial testimony of Mordechai Freund,

Mendel's employee, that Mendel had given Fried a $466,000 mortgage on Mendel's building in

-39-

September 2009—the same time Fried sent $466,000 to Mendel with the understanding that it would be worked off as legal fees:

> Q:   What was your understanding as to why Mr. Zilberberg gave a mortgage to Mr. Fried?
>
> MF:  I — I believe it was collateral for the money that Mr. Zilberberg had, because he gave a lot of money in advance of the — for legal fees. So I think he was afraid, if I remember correctly. I'm not sure if Fried told me this or Zilberberg or somebody.

(Tr. 368–69.)

Freund further testified that Mendel actually credited the $466,000 to Fried's account as payment for legal services:

> Q:   So I had previously asked about legal fees that Mr. Fried owed Mr. Zilberberg. Do you know if there was a time that Mr. Zilberberg credited Mr. Fried's account based on the loan money he had given him years earlier?
>
> MF:   Yes.
>
> Q:   And is that your understanding of how Mr. Zilberberg gave back that money to Mr. Fried?
>
> MF:   Correct.

(Tr. 372.)

Tellingly, this testimony establishes that this was the arrangement between Mendel and Fried at the time Fried sent Mendel $466,000 of the loan proceeds, not simply some backdated justification once the FDIC started investigating the loan. Because Mendel worked off the $466,000 he received from Fried (which was part of the loan proceeds) as legal fees, Mendel did not pay the $466,000 to the bank.

## III.   ANALYSIS

**A.    A PROBATIONARY SENTENCE WITH A PERIOD OF HOME CONFINEMENT IS A SIGNIFICANT SENTENCE THAT WOULD ADEQUATELY PUNISH MENDEL**

### 1.    Guidelines Analysis

The Probation Department's Pre-Sentence Report contains the following Guidelines analysis:

| Category | Points |
|---|---|
| **All Counts** | |
| Base Offense Level<br>U.S.S.G. § 2X1.1(c), 2B1.1(a)(1) | 7 |
| Loss Amount: (between $550,000 – $1,500,000)<br>U.S.S.G. § 2B11(b)(1)(H) | +14 |
| Sophisticated Means<br>U.S.S.G. § 2B1.1(b)(10)(C) | +2 |
| Abuse of Private Trust/Use of Special Skill<br>U.S.S.G. § 3B1.3 | +2 |
| Role Enhancement<br>U.S.S.G. § 3B1.1(c) | +2 |
| **Total Adjusted Offense Level** | **27** |

(PSR ¶¶ 45–55.)

The advisory Guidelines range associated with an adjusted offense level of 27 for an individual with a criminal history Category I (Mendel has no prior criminal record) is 70–87 months' imprisonment.

### 2.    Objections to Probation's Guidelines Analysis

In response to the draft PSR, counsel objected to the following portions of the PSR's Guidelines analysis.

###### i.    Position of Public or Private Trust/Use of a Special Skill

In ¶ 49, the draft PSR added a 2-level increase in the Guidelines based on U.S.S.G. § 3B1.3 for the abuse of a position of public or private trust or use of a special skill. The PSR includes this enhancement because Mendel "was a director on the Board of Directors of the Bank, was on the Compliance Committee of the Board, and was also a licensed attorney in New York State." (PSR § 49.) We object to this enhancement for the following reasons:

###### a.    Position of Public or Private Trust

The enhancement for abuse of public or private trust applies only if the abuse of trust "significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In addition, the Application Note to this Guideline explains that the enhancement applies where the position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, comment. (n.1). This is because "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.* The Application Note differentiates between levels of professional or managerial discretion by noting that this enhancement would apply to a bank executive's fraudulent loan scheme but not to embezzlement of theft by an ordinary bank teller. *Id.*

Here, Mendel was a director at the bank—not an executive. As such, he did not possess the level of professional or managerial discretion contemplated by this enhancement. Notably, as a director (not a manager or even an employee), Mendel was not in a position to direct the loan officer to approve the loan or in a position to conceal the loan once approved. Moreover, as an individual director, Mendel had no decision-making authority or discretion. This analysis does not change simply because Mendel was also on the bank's compliance committee, as there is no evidence that Mendel's role on that committee had any relevance to his criminal conduct.

-42-

Accordingly, not only was Mendel's director position not sufficient to meet the level of professional or managerial discretion required, his position also could not have significantly facilitated the commission or concealment of the offense.

In response to counsel's arguments, the government argued to the Probation Department that the abuse of trust enhancement was proper because Mendel "had substantial discretion in developing bank policy and managing bank executives and personnel, and he also had access to confidential and sensitive business information of the Bank." (PSR Addendum at p. 29.) The government further claimed that Mendel "used all of the resources available to him through his trusted position as a bank director in carrying out this fraud scheme." (*Id.*)

In rejecting counsel's objection, the PSR noted that, "as the director of the Bank, Zilberberg had the power to personally shepherd the fraudulent loan through the Bank's approval process and guard it from scrutiny, thereby abusing a position of trust." (*Id.* at 30.)

This Court should reject the arguments from the government and the Probation Department for the following reasons: First, even if Mendel had personal discretion in developing bank policies (which he did not as individual director in a full board of directors), there is no alleged connection between these bank policies (which the government has failed to specify) and the criminal conduct in this case.

Second, there was no evidence, at trial or otherwise, that Mendel had a role in managing any bank employee (executive or otherwise)—and certainly no evidence that he had a role in managing any bank employee who was involved in approving the Sauber loan in this case. In fact, the bank employee who reviewed the loan, Moshe Rosenwasser, testified that he would have told Mendel "to go to hell" if Mendel tried to "twist[] his arm" to recommend the loan. (Tr. 479.)

Third, that Mendel had "access to confidential and sensitive business information of the Bank" is irrelevant because the government has not shown, and cannot show, that this unspecified information "significantly facilitated the commission or concealment of the offense" as required for this enhancement under U.S.S.G. § 3B1.3.

Fourth, the government's bald assertion that Mendel "used all of the resources available to him through his trusted position as a bank director in carrying out this fraud scheme" is meaningless because it fails to specify what resources were available (other than the previously discussed and meritless claims of discretion in developing bank policies, managing bank employees and access to bank information) or how these unspecified resources significantly facilitated the commission or concealment of the offense.

Fifth, there is no evidence to support the Probation Department's argument that Mendel "personally shepherd[ed] the fraudulent loan through the Bank's approval process and guard it from scrutiny." At most, the trial evidence showed that Mendel referred the loan to the bank and provided documentation and information about the nature and purpose of the loan. Once submitted, the loan followed the natural course and approval process without any influence from Mendel. For these reasons, the public/private trust enhancement under § 3B1.3 should not apply.

### b.      Use of a Special Skill

As with the abuse of trust, the use of special skill enhancement only applies where the special skill is used "in a manner that significantly facilitated the commission or concealment of the offense." §3B1.3. Although Mendel was an attorney at the time, there is no evidence that he used his legal skills or legal knowledge to facilitate or conceal his criminal conduct.

In response to counsel's argument, the government argues that Mendel "used his position as an attorney to accomplish the fraud scheme," as he "directed the drafting and reviewed the Bank's legal documents for the execution of the fraudulent loans, and he also created legal

documents to accomplish the fraud scheme." (PSR Addendum at p. 29.) Relying on the government's argument, the Probation Department rejected counsel's objection to this enhancement, summarily noting that Mendel "used his knowledge and skills as an attorney when he reviewed and commented on the loan application and agreement." (*Id.* at p. 30.)

These arguments are meritless. First, Mendel did not direct the drafting of the bank's legal documents. To the extent Mendel responded to the loan officer's question as to the purpose of the loan (Tr. 411), that was not "directing" the drafting of bank's loan paperwork. Second, while there was evidence that Mendel reviewed the loan agreement, this review related to the terms of the loan (i.e., maturity date) and did not require any specialized legal skill. Third, even if Mendel reviewed and commented on the bank loan agreement, his review could not have "significantly facilitated the commission or concealment of the offense" as required under the enhancement because his proposed edits were rejected and did not affect the terms of the loan. Fourth, although the government alleges that Mendel "created legal documents to accomplish the fraud scheme," they have failed to specify which legal documents he supposedly created. If the government is referring to the drafting of a heter iska (i.e., a Jewish loan document), the government's argument fails because (1) a heter iska is a readily obtainable form document that does not require any special skill to draft; and (2) the evidence establishes that Mendel himself did not draft the heter iskas (*see* Tr. 330–32). For these reasons, this Court should not apply the special skill enhancement.

### ii.    Leadership Role

In ¶ 50, the draft PSR adds a 2-level leadership role increase pursuant to U.S.S.G. § 3B1.1(c) because Mendel was "a director on the Board of Directors at the Bank and was closely involved in obtaining funding for fraudulent loans from the Bank." The PSR, however, fails to

explain how either of these factors supports a 2-level role enhancement. In the Application Notes,

the Guidelines list several factors a court should consider in analyzing the role enhancement:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4).

Considering these factors, counsel submits that this enhancement should not apply for the

following reasons. First, the trial evidence established that co-conspirator Abraham Kahan (not

Mendel) devised the scheme to obtain a bank loan through a straw borrower. (Tr. 166–67.) To

facilitate this scheme, Kahan added the straw borrower to the deed of Kahan's house so that the

house could serve as collateral for the loan. (Tr. 167–68, 223.) Kahan even approached a different

bank with the straw borrower to obtain a straw loan. (Tr. 214–15.)  Notably, Kahan devised this

scheme and added the straw borrower to his deed before Mendel was ever approached about a loan

from Park Avenue Bank. *See* Fried Sentencing Tr. at 15 (government noting that "Kahan and Fried

were the entry point. They were the ones who came up with this idea to get the loan").

Second, the proceeds of the bank loan were divided equally between Mendel, Kahan and

Fried. Third, Kahan recruited the accomplices to his straw borrower scheme. Specifically, Kahan

testified that he approached the straw borrower about taking out the loan and directed the straw

borrower to apply for the loan at Park Avenue Bank and a previous bank. (Tr. 171, 214–15.) Kahan

also testified that he informed co-conspirator Aron Fried that he was having the straw borrower

take out the loan on Kahan's behalf. (Tr. 169–70.) By the time Mendel was involved, Kahan had

already recruited the necessary accomplices. For all these reasons, counsel argued to the Probation

Department that a leadership role enhancement is not appropriate in this case.

The government countered by arguing that a leadership role is appropriate because Mendel directed co-conspirators Aron Fried and Abraham Kahan, as well as his employee, Mordechai Freund, in carrying out the scheme. (PSR Addendum at p. 30.) The Probation Department also noted that, in addition to directing Fried, Kahan and Freund, Mendel also recruited his niece as a straw borrower in a different fraudulent scheme. (*Id.*)

The Court should reject these arguments for the following reasons. First, as to Freund and Mendel's niece, there is no allegation that they had any criminal responsibility in the scheme or that any of their conduct was criminal. Without more, they are not deemed a "participant" under the Guidelines' role enhancement provision. *See* U.S.S.G. § 3B1.1, comment. (n.1) ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."); *see also United States v. Harvey*, 532 F.3d 326, 338 (4th Cir. 2008) ("'Participants' are persons involved in the criminal activity who are criminally responsible, not innocent bystanders used in the furtherance of the illegal activity."). Because Freund and Mendel's niece are not "participants," and because the aggravating role enhancement requires that the defendant be the organizer, leader, manager, or supervisor of a "participant," the role enhancement here cannot be based on Mendel's relationship to Freund or his niece. *See* U.S.S.G. § 3B1.1, comment. (n.2) ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.").

Second, as to Kahan, the trial evidence established that Kahan never spoke with Mendel about the bank loan. (Tr. 224–25.) Accordingly, there is no evidence that Mendel ever directed Kahan in the criminal scheme. Third, as to Fried (and Kahan as well), the trial evidence established that each co-conspirator played a specific, yet equal role in the scheme. For example, as noted above, Kahan devised the scheme and recruited Sauber as the straw borrower (before Mendel was

even approached about a Park Avenue Bank loan). And Fried, in an attempt to raise money for his healthcare company, introduced the idea of Kahan using his loan proceeds to invest in Fried's company. (Tr. 171–72.) Mendel's role in the loan was to provide information to the bank. In other words, there was not one co-conspirator in a leadership role that was managing or directing the others; rather, each individual worked together to obtain the loan.[4]

### iii. Mendel Is Entitled to the Guideline's Zero Point Offender Adjustment Under U.S.S.G. § 4C1.1

On November 1, 2023, the Sentencing Guidelines were amended to include the Zero Point Offender adjustment under U.S.S.G. § 4C1.1, which provides a 2-level reduction for defendants who have no criminal history and who otherwise meet 10 separate criteria. The full text of the Zero Point Offender adjustment is as follows:

(a) ADJUSTMENT.—If the defendant meets all of the following criteria:

(1)    the defendant did not receive any criminal history points from Chapter Four, Part A;

(2)    the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3)    the defendant did not use violence or credible threats of violence in connection with the offense;

(4)    the offense did not result in death or serious bodily injury;

(5)    the instant offense of conviction is not a sex offense;

(6)    the defendant did not personally cause substantial financial hardship;

(7)    the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

---

[4] Tellingly, Fried did not receive a leadership role enhancement as part of his Sentencing Guidelines.

(8)     the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9)     the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10)    the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

decrease the offense level determined under Chapters Two and Three by 2 levels.

U.S.S.G. § 4C1.1.

As Mendel has no prior criminal history (PSR ¶ 58), he would be entitled to the 2-point reduction if he meets the remaining criteria. The only question is whether Mendel meets the criteria under subsection (a)(10)—that he did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848. As an initial matter, Mendel meets these criteria because, as argued above, the Probation Department should not have included a § 3B1.1 leadership adjustment under the facts of the case.

Moreover, even if this Court applies a leadership enhancement, Mendel should still meet the conjunctive nature of this subsection under the obvious textual reading of the Guideline provision that Mendel would only be excluded if he (1) received an aggravated role adjustment; and (2) was engaged in a continuing criminal enterprise. Because Mendel was not engaged in a continuing criminal enterprise, he is eligible for the 2-point reduction.

The Probation Department, however, rejects the simple textual reading of the provision by arguing that Mendel is not eligible for the 2-point reduction simply because he received a leadership role enhancement under § 3B1.1 (even though he was not engaged in a continuing criminal enterprise). (PSR Addendum at p. 30.) This reading of the adjustment flies in the face of the text and the Sentencing Commission's intent by reading the conjunctive word "and" as the

disjunctive word "or." As there is no basis in law or logic for the Probation Department's analysis, this Court should apply the 2-point reduction in this case.

In addition to the simple textual reading, the conjunctive nature of this criterion is further borne out by examining other subsections of adjustment. For example, § 4C1.1(a)(9) precludes the 2-point reduction where "the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) **or** §3A1.5 (Serious Human Rights Offense)" (emphasis added.) Similarly, § 4C1.1(a)(3) precludes the 2-point reduction where "the defendant did not use violence **or** credible threats of violence in connection with the offense" (emphasis added). In these two instances, the Guidelines chose the word "or" to make clear that a defendant would not receive the reduction if there was EITHER a vulnerable victim OR if it was a serious human rights offense (under subsection (a)(9)), or if the defendant used EITHER violence OR a credible threat of violence (under subsection (a)(3)). By using the disjunctive "or" for these criteria but using the conjunctive "and" for subsection (a)(10), the Sentencing Commission made its intent clear that a defendant would only not be entitled to the 2-point reduction if (1) he received an aggravated role adjustment; and (2) was engaged in a continuing criminal enterprise. To the extent Mendel was not engaged in a continuing criminal enterprise, this Court should find that he is entitled to the 2-point reduction under the Zero Point Offender adjustment.

In total, based on counsel's objections to the PSR's Guidelines calculation, Mendel's offense level should be reduced 6 points from a level 27 to a level 21 (removing +2 for abuse of trust/use of a special skill and +2 for leadership role and adding -2 for the Zero Point Offender adjustment). The advisory range associated with an adjusted offense level of 21 for an individual with a criminal history category 1 is 37–46 months' imprisonment.

**B.      The Sentencing Factors Set Forth in 18 U.S.C. § 3553 as Applied in this Case Support a Probationary Sentence with a Period of Home Confinement**

The Supreme Court has noted that, in sentencing a defendant, the sentencing court should fashion a punishment that "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88, 131 S. Ct. 1229, 1240 (2011). After considering Mendel's health, family circumstances and characteristics noted above and considering the relevant 18 U.S.C. § 3553 factors, this Court should find that a probationary sentence with a period of home confinement is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

**1.      A Probationary Sentence with a Period of Home Confinement is a Significant Punishment in this Case**

A sentencing court must balance several factors in fashioning an appropriate sentence, including whether the sentence imposed is enough "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). These concerns are met in this case with a sentence of probation, which, as noted by the Supreme Court, "substantially restrict[s]" a defendant's freedom:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Gall v. United States*, 552 U.S. 38, 48, 128 S. Ct. 586, 595-96 (2007) (citations omitted)); *see also United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S. Ct. 3164, 3169 (1987))); *Griffin*, 483 U.S. at 874, 107 S. Ct. at 3169 ("To a greater or lesser degree, it is always true of probationers (as we

-51-

have said it to be true of parolees) that they do not enjoy the 'absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600 (1972))); *United States v. Tolla*, 781 F.2d 29, 35 (2d Cir. 1986) ("[P]robation itself contains elements of punishment in the restraints imposed upon the freedom of the individual . . . ."); *United States v. Diambrosio*, No. 04-66, 2008 WL 732031, at *5 (E.D. Pa. Mar. 13, 2008) ("A probationary sentence would significantly limit Defendant's liberty and impose restrictions on his activities while allowing him to continue supporting his family and paying his substantial restitution obligation."); *cf. United States v. Zimmerman*, No. 10-CR-598, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) ("Imprisonment is not the only way we punish.  Supervised release brings with it a series of significant restrictions on a defendant's liberty. . . . Imprisonment is concededly a more onerous form of punishment, and different in kind from supervision, but [the defendant] is being punished.").[5]

Moreover, including a period of home confinement would make a probationary sentence in this case substantially more severe. In fact, the Sentencing Commission itself recognizes that, where authorized, one day of home detention is a suitable substitute for one day of imprisonment. *See* U.S.S.G. § 5C1.1(e)(3).

We respectfully submit that a probationary sentence with a period of home confinement is an appropriate and significant sentence in this case for the following reasons:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[5] For a list of mandatory and discretionary conditions of probation, *see* 18 U.S.C. § 3563 and U.S.S.G. § 5B1.3.



Third, the probationary sentence would be in addition to the several years of stress and anxiety that Mendel and his family have already suffered during the pendency of the investigation and prosecution of this matter. Although Mendel was not indicted until November 2019, the loan in this case has been investigated since 2013. Since that time, Mendel and his family have lived with the stress and anxiety caused by the uncertainty of Mendel's future.

Fourth, Mendel has already suffered significant punishment by losing his law license and profession. Should Mendel be imprisoned, it will be even harder for him to find a new career and employment to support his family once he is released—███████████████████████████████

███████. Without his ability to practice law, and with Mendel's monthly disability insurance payments set to end in April 2025 (*see* PSR ¶ 87 & n.7), Mendel is already struggling to provide for his family as is evidenced by his negative net worth of -$701,551.93 and monthly cash flow of a mere $846.54 (which will become a -$23,556.43 monthly cash flow once his medical disability payments ends in about 14 months). (PSR ¶ 87.) This struggle would become markedly worse— and a near impossibility—should he be imprisoned.

Fifth, a sentence of probation would not be inconsistent with the year and a day sentence this Court imposed on co-defendant Aron Fried. ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

Considering all these factors, a probationary sentence with a period of home confinement would be a significant punishment in this case.

### 2. Mendel's Character and Background Support a Probationary Sentence with a Period of Home Confinement

Section 3553(a) allows a sentencing court to consider a defendant in all of his unique humanity. As Judge Jed S. Rakoff of this District explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–514 (S.D.N.Y. 2006); *accord Gall v. United States*, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996))); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

The letters submitted on Mendel's behalf demonstrate his good deeds and charitable works. Post-*Booker*, a defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines. Notably, several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. *See, e.g.*, *United States v. Serafini*, 233 F.3d 758, 773, 774 (3d Cir. 2000) (upholding the district court's downward departure where many of the letters supporting Serafini "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money"). As *Serafini* and other cases make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the 18 U.S.C. § 3553(a) factors, a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider.[6]

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. *See, e.g.*, *Tomko*, 562 F.3d at 572 (describing how the defendant's

---

[6] *See, e.g.*, *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); *United States v. Cooper*, 394 F.3d 172, 177, 178 (3d Cir. 2005) (noting that "[d]ownward departures for good works . . . are permissible when the works are exceptional," and  upholding the departure where the defendant's good works included "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others").

"charitable acts that involved not only money, but also his personal time"); *Cooper*, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); *Serafini*, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self").

As described in the many letters discussed above, Mendel's good deeds have involved his time and effort and not only his money. Furthermore, as these personal vignettes demonstrate, Mendel's good deeds have been exceptional and extensive in scope, manifested by letters submitted in Mendel's support detailing his extremely impressive acts of kindness. These letters demonstrate that Mendel's good deeds have impacted countless people. As best summed up by the chairman of the World Zionist Organization, Yaakov Hagoel:

> Mendel Zilberberg is a man who simply does not care about the other person's affiliation, community, orientation, views, or background. The single thing he cares about is the person – and how to make things better for him or her on a personal level.

(Ex. 60: Yaakov Hagoel Letter at 1; *see also* Ex. 25: Rabbi Yosef Yitzchak Jacobson Letter at 2 ("Mendel has also been available directly to numerous individuals with diverse challenges and needs, relating to medical situations, domestic issues, children at risk, business, and various other issues and has given readily of himself. . . . In many cases, I have sent people who needed emotional, financial, or spiritual help, to Mendel, and he has always opened his heart with warmth and generosity to them.").) To the extent a defendant's good deeds are a relevant factor in fashioning a proper sentence, the countless lives that Mendel has positively impacted support a probationary sentence.

**3. Neither Specific nor General Deterrence Will Be Served by Incarceration**

In fashioning an appropriate sentence, the Court should take into account the need for deterrence, and to protect the public from the potential that the defendant will commit additional crimes in the future. Under this prong of § 3553(a), courts assess whether a sentence will sufficiently deter the defendant from committing further crimes, and the public at large from committing similar offenses.

**i. A Prison Sentence is Not Required to Further the Goals of Specific Deterrence or the Need to Protect the Community**

The "likelihood that [a defendant] will engage in future criminal conduct" is "a central factor that district courts must assess when imposing sentence." *Pepper v. United States*, 562 U.S. 476, 487–88, 131 S. Ct. 1229, 1242 (2011). Several factors demonstrate that there is little to no risk that Mendel will recidivate after serving a probationary sentence with a period of home confinement:

- Mendel is a 65-year-old first-time offender. *See United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017) (discussing how recidivism substantially decreases with age); and

- Mendel has not committed any crimes **in the last 14 years** since the criminal conduct in this case ended;

- Mendel is no longer a practicing attorney and is not a board member of any bank; and

- Mendel has already seen how his conviction negatively affected his job prospects. *See United States v. Amarante*, No. 08-CR-76, 2008 WL 4427917, at *2 (E.D.N.Y. Sept. 22, 2008) ("Specific deterrence is satisfied by the sentence in light of the defendant" law abiding background and the fact that he cannot apply for certain employment because of this felony conviction.").

Given the minimal to no risk of Mendel reoffending, a prison sentence is not required to achieve specific deterrence.

ii.   **A Prison Sentence is Not Necessary to Further General Deterrence**

Imposing a significant sentence will not serve the general deterrence purposes under § 3553(a). Indeed, research has consistently shown that, while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*

Moreover, because deterrence is only one factor to be considered under § 3553(a), in assessing the deterrent value of any aspect of a sentence, this Court can and should assume that people learning of the sentence will also be aware of all the facts the Court considered. Accordingly, a probationary sentence with a period of home confinement—which, as noted above, is a significant sentencing in this case ████████████████████████████████████████ ████████████████—would still act as a general deterrence.

IV.   **CONCLUSION**

Respectfully, in the final analysis, the sort of man that Mendel Zilberberg has always been, and continues to be—as reflected in the extraordinary letters accompanying this Sentencing Memorandum and extricated from his otherwise inexplicable criminal conduct—should be the Court's ultimate focus of attention.  For as the Supreme Court reminded us in *Pepper*: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United*

*States*, 562 U.S. 476, 487, 131 S. Ct. 1229, 1239–40 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (internal quotes omitted)).

 For all the reasons set forth herein—Mendel's physical health and family circumstances—counsel respectfully submits that, consistent with Section 3553(a), a probationary sentence with a period of home confinement would be the sentence "sufficient, but not greater than necessary," to accomplish the traditional goals of sentencing.

Dated: February 5, 2024
  New York, NY

        Respectfully submitted,

        Benjamin Brafman, Esq.
        Jacob Kaplan, Esq.
        Brafman & Associates, P.C.
        *Attorneys for Mendel Zilberberg*
        256 Fifth Avenue, 2nd Floor
        New York, NY 10001